45 A.3d 605 (2012)
305 Conn. 412
STATE of Connecticut
v.
Anthony THOMPSON.
No. 18553.
Supreme Court of Connecticut.
Argued February 3, 2012.
Decided June 19, 2012.
*607 Lisa J. Steele, special public defender, for the appellant (defendant).
*608 Rocco A. Chiarenza, deputy assistant state's attorney, with whom, on the brief, were Gail P. Hardy, state's attorney, and David L. Zagaja and Richard J. Rubino, senior assistant state's attorneys, for the appellee (state).
ROGERS, C.J., and NORCOTT, PALMER, ZARELLA, McLACHLAN, EVELEIGH and HARPER, Js.
ZARELLA, J.
The defendant, Anthony Thompson, appeals from the judgment of conviction, rendered after a jury trial, of one count of murder in violation of General Statutes § 53a-54a and two counts of assault in the first degree in violation of General Statutes § 53a-59 (a)(5). On appeal, the defendant claims that the trial court abused its discretion in (1) applying the preponderance of the evidence standard to admit into evidence, under the forfeiture by wrongdoing doctrine, a statement to the police and a signed photographic array by a deceased eyewitness identifying the defendant as the shooter, (2) concluding that the defendant had forfeited his confrontation clause rights[1] primarily on the basis of the testimony of a jailhouse informant that the defendant had caused the death of the witness, and (3) ruling, sua sponte, that the state could introduce prejudicial evidence at trial that the defendant was responsible for the death of the witness to show consciousness of guilt. The state responds that the trial court applied the proper standard in admitting the statement and signed photographic array into evidence, there was sufficient evidence in the record to support the trial court's finding that the defendant had caused the death of the witness, and the trial court properly admitted evidence relating to the circumstances surrounding the death of the witness to show consciousness of guilt. We affirm the judgment of the trial court.
The jury reasonably could have found the following facts. On the evening of February 13, 2005, at approximately 11 p.m., the defendant and Andre Drummond arrived at the Cleveland Cafe (bar) in the city of Hartford, where the defendant planned to meet one of his girlfriends, Sherlon Glassford. The defendant drove to the bar in a 2002 silver Infiniti that belonged to him and to his other girlfriend, Renata Lovelace, but was registered in Lovelace's name. Also at the bar that evening were three other men, O'Neill Robinson, Barrington Delisser (Barrington) and Boris Delisser (Marcel), who entered through the main entrance and were searched by security personnel for weapons. The three men went to a separate room located on the left side of the bar, where Marcel began a conversation with Glassford and Asher Glace, both of whom he knew. While Marcel was talking with Glassford, Drummond moved in between them and began his own conversation with Glassford. During the conversation, Drummond stepped on Marcel's foot. When Marcel stepped back, Drummond turned around and stepped on his foot again. After the two exchanged words, Drummond walked over and spoke with the defendant.
Approximately thirty minutes later, the defendant approached the group and spoke briefly with Glassford. He then turned around and began arguing with Marcel *609 about his earlier interaction with Drummond. Robinson, who had been standing behind Marcel, stepped in between Marcel and the defendant. The defendant then shoved Robinson, and a fight ensued. At least four people participated in the fight, including the defendant, Robinson, Robinson's nephew, Ryan Saunders, and a man known as "Hollywood." During the fight, the defendant struck Saunders on the head with a beer bottle, causing him to collapse on the floor. Hollywood responded by pulling out a knife and stabbing the defendant, causing him to bleed from his face and arm. The fight lasted for approximately two or three minutes before security personnel intervened.
After the fight, the defendant left the bar, went to his Infiniti and retrieved a gun. He immediately went back and reentered the bar through an exit door, thus avoiding security, and fired at least three bullets. One bullet struck the back of Robinson's head, causing his death. A second bullet struck another patron, Renita Fair, in the back of her right thigh. A third bullet struck Barrington in the right leg.
Following the shooting, the defendant ran out of the bar, removed the license plate on the Infiniti and fled from the scene in another vehicle. Another patron, James Castellani, who was smoking a cigarette outside, saw blood drip from the defendant's arm onto the rear bumper of the Infiniti. The defendant did not go to a hospital in Hartford to seek attention for his injuries but traveled to Midstate Medical Center in the city of Meriden, where he received treatment under the name of his brother, Earl Thompson. The next day, the defendant fled to Jamaica.
On May 11, 2005, the defendant was extradited to the United States and charged with murder and two counts of assault in the first degree. At trial, four witnesses testified that the defendant was in possession of a firearm immediately before or after the shooting, and two witnesses identified him as the shooter.[2] A written statement by Glace, the only person to identify the defendant as the shooter before the trial, was also admitted into evidence. A jury found the defendant guilty as charged, and, on September 19, 2008, the trial court sentenced him to a total effective sentence of seventy years incarceration. This appeal followed.

I
The defendant first claims that the trial court improperly applied the preponderance of the evidence standard in permitting the state to introduce into evidence, under the forfeiture by wrongdoing doctrine, a contemporaneous statement and signed photographic array by a deceased eyewitness identifying the defendant as the shooter.[3] The defendant claims that *610 the standard for the admission of the statement and signed photographic array, which constituted hearsay, should have been clear and convincing evidence that he wrongfully caused the witness to be unavailable because he was unable to exercise his federal and state constitutional rights to confrontation due to the witness' unavailability. The state responds that the trial court properly applied the preponderance standard because it is more effective in discouraging defendants from obtaining an advantage at trial by taking matters into their own hands in order to render witnesses unavailable and because the vast majority of federal and state courts apply the preponderance standard. We agree with the state.
The following additional facts are relevant to our resolution of this claim. Immediately after the shooting, Glace provided a sworn, written statement to the Hartford police describing the altercation and stating that she saw the defendant fire a gun from the doorway of the bar and then run away. Glace also viewed a photographic array at the police station from which she identified the defendant as the shooter. On June 1, 2007, during a pretrial proceeding at which the defendant was present, the state informed the court that it intended to proceed with the defendant's prosecution. Approximately two weeks later, on June 17, 2007, the Hartford police found Glace dead from multiple gunshot wounds inside her car, which was parked in her driveway.
On April 7, 2008, shortly before jury selection was scheduled to begin, the state filed a notice of intent to offer into evidence Glace's sworn, written statement identifying the defendant as the shooter. The state argued that the statement should be admitted under the forfeiture by wrongdoing doctrine because the defendant had caused Glace to be unavailable at trial. At the hearing on the motion, the state argued that the preponderance of the evidence standard should apply to the court's preliminary determination as to whether the statement should be admitted, and the defense argued that the clear and convincing standard should apply.
On May 28, 2008, the court issued its decision. Citing State v. Henry, 76 Conn. App. 515, 820 A.2d 1076, cert. denied, 264 Conn. 908, 826 A.2d 178 (2003), the court concluded that the defendant had forfeited his right of confrontation and any hearsay objection he might otherwise have had regarding the admissibility of the statement because he had procured the unavailability of Glace for the purpose of preventing her from testifying. In reaching this conclusion, the trial court made factual findings regarding (1) comments made by the defendant to a jailhouse informant, Steven Nelson, (2) the defendant's contacts with his brother, Earl Thompson, during the defendant's incarceration following his arrest, (3) the state's decision to prosecute, (4) the circumstances surrounding Glace's death, and (5) several recorded telephone conversations between the defendant and his brother that the defendant had initiated from the correctional facility, which it deemed unnecessary to its ultimate conclusion.
The trial court subsequently determined that Glace's statement was reliable and that its probative value outweighed its prejudicial effect.[4] The trial court further *611 determined that the applicable standard for admitting the statement was proof by a preponderance of the evidence that the defendant had engaged in wrongful conduct that rendered Glace unavailable as a witness. The court observed that the advisory committee notes to rule 804(b)(6) of the Federal Rules of Evidence, which covers the admissibility of such evidence in federal courts, approves of the preponderance standard. Moreover, all or virtually all federal circuit courts of appeals apply the preponderance standard, and the standard is applied in related contexts, such as in determining whether a confession was voluntary or whether there was consent to a search. The court explained that State v. Jarzbek, 204 Conn. 683, 705, 529 A.2d 1245 (1987), cert. denied, 484 U.S. 1061, 108 S.Ct. 1017, 98 L.Ed.2d 982 (1988), which applied the clear and convincing evidence standard to the admission of testimony by an unavailable witness, was distinguishable because the underlying offense in Jarzbek, sexual assault of a child, had created the confrontation right issue in that case, whereas the defendant's own additional misconduct had created the issue in the present case. The court distinguished the present case from cases in which the state must show by clear and convincing evidence a reliable, independent basis for a subsequent in-court identification, stating that there was no impropriety or misconduct on the part of the police and no possibility that a tainted identification would affect any subsequent in-court identification of the defendant in the present case. The court thus granted the state's motion to admit the statement at trial because it found that it was more likely than not that the defendant intended to, and did, engage or participate in conduct that had brought about Glace's death for the purpose of preventing her from testifying.
With this factual backdrop in mind, we turn to the standard of review. It is well established that "[w]hen a party contests the burden of proof applied by the trial court, the standard of review is de novo because the matter is a question of law." Cadle Co. v. D'Addario, 268 Conn. 441, 455, 844 A.2d 836 (2004); accord Smith v. Muellner, 283 Conn. 510, 536, 932 A.2d 382 (2007).
With respect to the applicable legal principles, we begin with the constitutionally protected confrontation right at issue. The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." Similarly, the constitution of Connecticut, article first, § 8, provides in relevant part: "In all criminal prosecutions, the accused shall have a right ... to be confronted by the witnesses against him...." The right of an accused to confrontation in a criminal trial "is, in essence, the right to a fair opportunity to defend against the [s]tate's accusations. The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process." (Internal quotation marks omitted.) State v. *612 Rolon, 257 Conn. 156, 175, 777 A.2d 604 (2001).
The right of confrontation, however, is not absolute. "The United States Supreme Court has recognized that competing interests may warrant dispensing with confrontation at trial." (Internal quotation marks omitted.) State v. Jarzbek, supra, 204 Conn. at 693, 529 A.2d 1245. This court has also stated that "the right to confront and to cross-examine witnesses... may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." (Internal quotation marks omitted.) State v. Alexander, 254 Conn. 290, 298, 755 A.2d 868 (2000). For example, this court has recognized that the right of confrontation is not violated by the substantive use of a prior statement when the declarant is unavailable and the statement bears adequate indicia of reliability. See, e.g., State v. Outlaw, 216 Conn. 492, 504-505, 582 A.2d 751 (1990).
Among the many reasons why a declarant may be unavailable is the defendant's own misconduct, such as when the defendant has caused "a witness to be unavailable for trial for the purpose of preventing that witness from testifying." State v. Jarzbek, supra, 204 Conn. at 698, 529 A.2d 1245. "Neither in criminal nor in civil cases will the law allow a person to take advantage of his own wrong. Thus, if a witness' silence is procured by the defendant himself, whether by chicanery, United States v. Mayes, 512 F.2d 637, 648-51 (6th Cir.), cert. denied, 422 U.S. 1008, 95 S.Ct. 2629, 45 L.Ed.2d 670 (1975) [and cert. denied sub nom. Cook v. United States, 423 U.S. 840, 96 S.Ct. 69, 46 L.Ed.2d 59 (1975)], by threats, United States v. Balano, 618 F.2d 624, 628-29 (10th Cir.1979), cert. denied, 449 U.S. 840, 101 S.Ct. 118, 66 L.Ed.2d 47 (1980); United States v. Carlson, 547 F.2d 1346 [1352-53, 1360] (8th Cir.1976), cert. denied [sub nom. Hofstad v. United States], 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977), or by actual violence or murder, United States v. Thevis, 665 F.2d 616, 630-31 (5th Cir.), cert. denied, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982) [and cert. denied sub nom. Hood v. United States, 458 U.S. 1109, 102 S.Ct. 3489, 73 L.Ed.2d 1370 (1982), and cert. denied sub nom. Evans v. United States, 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303 (1982)], the defendant cannot then assert his confrontation clause rights in order to prevent prior ... testimony of that witness from being admitted against him. Any other result would mock the very system of justice the confrontation clause was designed to protect." (Internal quotation marks omitted.) United States v. Mastrangelo, 693 F.2d 269, 272-73 (2d Cir. 1982); see also State v. Jarzbek, supra, at 697-99, 529 A.2d 1245.
In addressing a potential witness' unavailability because of violence or murder caused by the defendant, "[t]he United States Court of Appeals for the District of Columbia Circuit has stated: It is hard to imagine a form of misconduct more extreme than the murder of a potential witness. Simple equity supports a forfeiture principle, as does a common sense attention to the need for fit incentives. The defendant who has removed an adverse witness is in a weak position to complain about losing the chance to cross-examine him. And where a defendant has silenced a witness through the use of threats, violence or murder, admission of the [witness'] prior statements at least partially offsets the perpetrator's rewards for his misconduct. We have no hesitation in finding, in league with all [Circuit Courts of Appeals] to have considered the matter, that a defendant who wrongfully procures the absence of a witness or potential witness *613 may not assert confrontation rights as to that witness. United States v. Dhinsa, [243 F.3d 635, 652 (2d Cir.), cert. denied, 534 U.S. 897, 122 S.Ct. 219, 151 L.Ed.2d 156 (2001)], quoting United States v. White, 116 F.3d 903, 911 (D.C.Cir.) ... cert. denied, 522 U.S. 960, 118 S.Ct. 390, 139 L.Ed.2d 305 (1997)." (Internal quotation marks omitted.) State v. Henry, supra, 76 Conn.App. at 533, 820 A.2d 1076.
The common-law principle that a defendant cannot be allowed to benefit by procuring the absence of a potential witness through his own wrongdoing was codified in the Federal Rules of Evidence in 1997 and in the Connecticut Code of Evidence in 2008. Rule 804(b)(6) of the Federal Rules of Evidence provides that "[a] statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness" is not excluded by the hearsay rule. Section 8-6(8) of the Connecticut Code of Evidence likewise provides that "[a] statement offered against a party who has engaged in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness" is not excluded by the hearsay rule. Although the federal rule is broader because it applies to defendants who have "engaged or acquiesced" in wrongdoing, whereas the state rule applies only to defendants who have "engaged" in wrongdoing, both rules are firmly rooted in the principle that "no one shall be permitted to take advantage of his own wrong...." Reynolds v. United States, 98 U.S. 145, 159, 25 L.Ed. 244 (1878).
The parties do not dispute the trial court's application of the doctrine in this case, but, rather, the burden of proof that should be employed to determine whether evidence is admissible under the doctrine. Rule 804(b)(6) provides that the government has the burden of proving the defendant's forfeiture of his confrontation right by a preponderance of the evidence. See Fed.R.Evid. 804(b)(6), advisory committee note (adopting preponderance of evidence standard required under rule 104[a] of Federal Rules of Evidence "in light of the behavior ... [r]ule 804[b][6] seeks to discourage"); see also, e.g., United States v. Dhinsa, supra, 243 F.3d at 653-54. The Connecticut Code of Evidence, however, does not address the applicable burden of proof under § 8-6(8), and this court has not been asked to do so in past cases. Accordingly, it is an issue of first impression in Connecticut.
"[T]he function of the burden of proof employed by the court is to allocat[e] the risk of error between the litigants and indicat[e] the relative importance of the ultimate decision.... [A] standard of proof represents an attempt to instruct the [fact finder] concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication. Although the phrases preponderance of the evidence and [clear and convincing evidence] are quantitatively imprecise, they do communicate to the finder of fact different notions concerning the degree of confidence he is expected to have in the correctness of his factual conclusions.... Further, the standard of proof influences the relative frequency... of erroneous outcomes ... either in favor of the state when the true facts warrant judgment for the defendant or in favor of the defendant when the true facts warrant judgment for the state.... Because the standard of proof affects the comparative frequency of these two types of erroneous outcomes, the choice of the standard to be applied in a particular kind of litigation should, in a rational world, reflect an assessment of the comparative social disutility of each." (Citations omitted; *614 internal quotation marks omitted.) State v. James, 237 Conn. 390, 422, 678 A.2d 1338 (1996).
The lower standard of more probable than not "reflect[s] the view that the `social disutility' of an erroneous decision in either direction is comparable." Id., at 423, 678 A.2d 1338. In contrast, the more stringent "`intermediate'" standard of clear and convincing proof, with its "emphasis on the high probability and the substantial greatness of the probability of the truth of the facts asserted"; (emphasis altered) Miller v. Commissioner of Correction, 242 Conn. 745, 794-95, 700 A.2d 1108 (1997); "deliberately shifts the risk of an erroneous decision ... [and] reflects the view that it is much worse to make an erroneous decision in favor of one party than it is to make it in favor of the other." In re Eden F., 48 Conn.App. 290, 316-17, 710 A.2d 771 (1998), rev'd on other grounds, 250 Conn. 674, 741 A.2d 873 (1999). Having considered the comparative social disutility of the two standards in the present context, we conclude that the preponderance standard should be employed in determining whether a defendant has procured the unavailability of a witness under § 8-6(8) of the Connecticut Code of Evidence, thereby rendering evidence provided by the witness admissible at trial.
We reach this conclusion for several reasons. First, the social disutility of an erroneous decision by the trial court that favors the defendant by precluding evidence from an unavailable witness under the clear and convincing standard is much greater than that of an erroneous decision that favors the state by admitting such evidence under the preponderance standard. Improper preclusion of the evidence under the higher standard would interfere with three significant policy rationales on which the forfeiture doctrine is founded, namely, "to remove any profit that a defendant might receive from his own wrongdoing ... to provide a strong deterrent against intimidation and violence directed at witnesses by defendants attempting to game the judicial system ... [and to further] the truth-seeking function of the adversary process, allowing fact finders access to valuable evidence no longer available through live testimony." (Citations omitted; internal quotation marks omitted.) State v. Byrd, 198 N.J. 319, 337-38, 967 A.2d 285 (2009); see also Commonwealth v. Edwards, 444 Mass. 526, 534-35, 830 N.E.2d 158 (2005). Although an erroneous decision to admit evidence under the preponderance standard deprives the defendant of his constitutional right of confrontation, opportunities remain to challenge the admission of the evidence on grounds of reliability or prejudicial effect. See, e.g., United States v. Aguiar, 975 F.2d 45, 47 (2d Cir.1992) ("[w]e may assume that the admission of facially unreliable hearsay would raise a due process issue, although it is hard to imagine circumstances in which such evidence would survive ... [the] test of weighing probative value against prejudicial effect, an objection that is not waived by procuring a [witness'] absence"); see also State v. Munoz, 233 Conn. 106, 137-39, 659 A.2d 683 (1995) (considering whether prior testimony of unavailable witness at probable cause hearing bore adequate indicia of reliability); State v. Byrd, supra, at 198 N.J. at 353, 967 A.2d 285 (statement of witness taken in manner prescribed by state evidentiary rules and determined to be reliable in light of all of surrounding circumstances is "admissible as substantive evidence if the [s]tate establishes that the defendant wrongfully procured the [witness'] unavailability").
In State v. James, supra, 237 Conn. 390, 678 A.2d 1338, in which we discussed why *615 the preponderance standard is appropriate when a court is asked to determine whether a confession is voluntary for the purpose of admission at trial, we stated that "safeguards against the admission of false confessions other than a stringent burden of proof are already in place. The state must demonstrate the corpus delicti of the crime to which the defendant has confessed.... Additionally, the defendant ... [is] free ... to familiarize a jury with circumstances that attend the taking of his confession, including facts bearing upon its weight and voluntariness.... Before deciding to convict, the jury must determine whether the confession is to be credited, and, if so, whether it is sufficient with any other evidence to demonstrate guilt beyond a reasonable doubt. We have recently reiterated our confidence in the ability of juries to discern the proper weight to be afforded conflicting evidence in this area....
"At stake for the state in the application of any exclusionary rule is its interest in efficient, effective law enforcement. The exclusionary rule at issue occasions the loss of otherwise relevant and powerful evidence of guilt, the loss of which might seriously weaken if not decimate a state's case. The cost of the trial court possibly excluding more confessions because of a higher standard of proof is to permit defendants to avoid trial and a just conviction by a jury, when the jury would have the opportunity to consider all of the circumstances under which the confession was elicited and weigh it accordingly. We are not persuaded that any incremental, indirect or speculative benefit that might flow from imposition of [a higher] standard to the voluntariness determination substantially outweighs its increased costs to effective law enforcement and to the truth seeking process. We remain convinced, rather, that the preponderance standard provides a fair and workable test ... that strikes the appropriate balance, in light of our historical background and contemporary policy concerns, between the various interests at stake. The preponderance standard, we believe, is entirely consonant with the general contours of a constitutional safeguard rooted in flexible principles of due process." (Citations omitted; internal quotation marks omitted.) Id., at 424-26, 678 A.2d 1338. The same reasoning applies to the admission of statements by an unavailable witness under the forfeiture by wrongdoing doctrine. Indeed, the court in the present case specifically discussed the reliability of Glace's statement and alluded to its potentially prejudicial effect before admitting it into evidence. See footnote 4 of this opinion. Accordingly, we conclude that a social disutility analysis favors application of the preponderance standard in this context.
As we previously indicated, the preponderance standard also is consistent with the standard used by courts in making other preliminary determinations of fact involving a defendant's constitutional rights, such as whether a confession was voluntary; State v. Lawrence, 282 Conn. 141, 177, 920 A.2d 236 (2007); State v. James, supra, 237 Conn. at 425-26, 678 A.2d 1338; whether there was free and voluntary consent to a search; State v. Jenkins, 298 Conn. 209, 249 n. 32, 3 A.3d 806 (2010); see also United States v. Isiofia, 370 F.3d 226, 230 (2d Cir.2004) ("[t]he government has the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary"); and whether the testimony of an unavailable witness should be admitted under the coconspirator exception to the hearsay rule. See State v. Camacho, 282 Conn. 328, 353-54, 924 A.2d 99, cert. denied, 552 U.S. 956, 128 S.Ct. 388, 169 L.Ed.2d 273 (2007).
Finally, the preponderance standard is applied not only by all federal courts pursuant *616 to the Federal Rules of Evidence but also by the overwhelming majority of states that have considered the matter. See, e.g., State v. Valencia, 186 Ariz. 493, 498, 924 P.2d 497 (App.1996); People v. Giles, 40 Cal.4th 833, 853, 152 P.3d 433, 55 Cal.Rptr.3d 133 (Cal.2007), vacated on other grounds, 554 U.S. 353, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008); Vasquez v. People, 173 P.3d 1099, 1105 (Colo.2007); Devonshire v. United States, 691 A.2d 165, 169 (D.C.1997), cert. denied sub nom. Vines v. United States, 520 U.S. 1247, 117 S.Ct. 1859, 137 L.Ed.2d 1060 (1997); People v. Stechly, 225 Ill.2d 246, 278, 312 Ill.Dec. 268, 870 N.E.2d 333 (2007); State v. Hallum, 606 N.W.2d 351, 355-56 (Iowa 2000); State v. Jones, 287 Kan. 559, 567-68, 197 P.3d 815 (2008); Parker v. Commonwealth, 291 S.W.3d 647, 669-70 (Ky. 2009), cert. denied, ___ U.S. ___, 130 S.Ct. 1293, 175 L.Ed.2d 1084 (2010); State v. Magouirk, 539 So.2d 50, 65 (La.App. 1989); Commonwealth v. Edwards, supra, 444 Mass. at 542, 830 N.E.2d 158; People v. Jones, 270 Mich.App. 208, 215-17, 714 N.W.2d 362, appeal denied, 477 Mich. 866, 721 N.W.2d 215 (2006); State v. Wright, 726 N.W.2d 464, 479 n. 7 (Minn.2007); State v. Byrd, supra, 198 N.J. at 352, 967 A.2d 285; State v. Alvarez-Lopez, 136 N.M. 309, 314, 98 P.3d 699 (2004), cert. denied, 543 U.S. 1177, 125 S.Ct. 1334, 161 L.Ed.2d 162 (2005); State v. Hand, 107 Ohio St.3d 378, 392, 840 N.E.2d 151, cert. denied, 549 U.S. 957, 127 S.Ct. 387, 166 L.Ed.2d 277 (2006); State v. Ivy, 188 S.W.3d 132, 147 (Tenn.), cert. denied, 549 U.S. 914, 127 S.Ct. 258, 166 L.Ed.2d 200 (2006); Gonzalez v. State, 195 S.W.3d 114, 124 and n. 41 (Tex.Crim.App.), cert. denied, 549 U.S. 1024, 127 S.Ct. 564, 166 L.Ed.2d 418 (2006); State v. Poole, 232 P.3d 519, 526 (Utah 2010); State v. Mechling, 219 W.Va. 366, 381, 633 S.E.2d 311 (2006); State v. Jensen, 299 Wis.2d 267, 302, 727 N.W.2d 518 (2007).[5] Accordingly, we conclude that Connecticut should adopt the preponderance standard and that the trial court properly applied that standard in the present case.
The defendant acknowledges that only a few states apply the clear and convincing standard, including Maryland, by statutory authority; Md.Code Ann., Cts. & Jud. Proc. § 10-901(b)(2) (LexisNexis 2006); and New York and Washington, by judicial determination. See People v. Geraci, 85 N.Y.2d 359, 367, 649 N.E.2d 817, 625 N.Y.S.2d 469 (1995); State v. Mason, 160 Wash.2d 910, 926-27, 162 P.3d 396 (2007), cert. denied, 553 U.S. 1035, 128 S.Ct. 2430, 171 L.Ed.2d 235 (2008). The defendant nonetheless argues that Connecticut should follow the minority view and adopt the clear and convincing standard because the deprivation of a person's confrontation clause rights is at least as significant as the termination of parental rights; see General Statutes § 17a-112 (i) and (j); In re Valerie D., 223 Conn. 492, 511, 613 A.2d 748 (1992); involuntary civil commitment; see, e.g., General Statutes § 17a-685 (d); and involuntary conservatorship; see, e.g., General Statutes § 45a-650 (f)(1) and (2); all of which affect personal autonomy and require application of the clear and convincing standard. We disagree. An ultimate decision relating to personal autonomy is qualitatively different from a preliminary factual determination regarding the admission of testimony by an unavailable *617 witness, which does not constitute a final decision on the merits and is only one of many pieces of evidence that the fact finder must consider in determining the defendant's ultimate guilt. Accordingly, the burden of proof need not be as high as the burden of proof required for a final ruling on a matter that affects personal autonomy.
The defendant also argues that the clear and convincing standard should be adopted because the court applied the higher standard in State v. Jarzbek, supra, 204 Conn. at 684-88, 705, 529 A.2d 1245, in which the state videotaped the minor victim's testimony outside the defendant's presence in anticipation of introducing the videotape at trial. Jarzbek, however, is distinguishable. The issue in that case was whether the videotaping procedure unduly infringed on the defendant's right to "face-to-face" confrontation of an available adverse witness whose testimony he could observe through a one-way mirror and who was subject to direct and cross-examination at a hearing before the trial judge. Id., at 694-96, 529 A.2d 1245. In this context, the court determined that, in order to balance the defendant's confrontation right with the enhanced reliability of a minor victim's testimony taken outside the physical presence of the accused, the state would be required to demonstrate a compelling need, by clear and convincing evidence, for excluding the defendant from the witness room during the videotaping by showing that the victim would be so intimidated, or otherwise inhibited, by the physical presence of the defendant that the trustworthiness of the victim's testimony would be called into question. Id., at 704-705, 529 A.2d 1245. Furthermore, the court specifically contrasted the facts before it from circumstances like those in the present case, in which a "defendant [is] suspected of scheming to obstruct justice by tampering with a witness after the crime in question [has] occurred, the judicial proceedings against him [have] commenced, and the witness allegedly subjected to intimidation [has] given pretrial testimony [or a statement] incriminating the defendant." Id., at 699, 529 A.2d 1245. The court described such conduct as constituting a "waiver" of the defendant's "right of physical confrontation." Id. Jarzbek thus provides no support for the defendant's claim.

II
The defendant next claims that the evidence was insufficient to prove, even by a preponderance of the evidence, that the defendant intentionally procured the death of Glace. The defendant does not dispute that Glace was murdered but claims that there were no witnesses or forensic evidence linking him or his brother to her death, and, consequently, the evidence fails to establish that he procured her unavailability as a witness. The state responds that the evidence was sufficient to support the trial court's finding that the defendant was complicit in causing Glace's death. We agree with the state.
The following additional facts are relevant to our resolution of this claim. The trial court found that, during the defendant's incarceration in 2005, he made certain incriminating statements concerning his involvement in the shooting to another incarcerated offender, Nelson, whose case was also pending at that time. Among these statements were that the defendant knew of certain potential witnesses, including Glace, who would testify against him at trial and of what might happen to those witnesses to prevent them from testifying. The defendant also stated that he had asked his brother, Earl Thompson, to arrange for a third party to talk to Glace to persuade her not to testify, but, after learning that such a conversation had occurred *618 and that Glace still intended to testify, he decided that he would have Glace killed to prevent her from testifying and that he was going to call his brother and ask him to take care of it.
The court also made several findings regarding the relationship of the defendant to his brother. These included that his brother was on the approved telephone call list of the correctional facility at which the defendant was imprisoned as of October 16, 2006, that the two had telephone conversations after that time, and that his brother was approved on March 21, 2007, for noncontact visits with the defendant at the correctional facility. The court further found that the defendant and his brother had met on March 22, March 26, April 12, and June 30, 2007, during which they were physically separated by a pane of glass and limited to the use of a two-way telephone, which was not monitored.
In addition, the court found that, on March 29, 2007, the defendant rejected a proposed plea agreement, and his case was placed on the trial list. The court also found that, on June 1, 2007, the defendant was brought to court, the case was continued until July 11, 2007, and the presiding judge indicated that the parties should begin to prepare for trial.
The trial court then turned to evidence relating to the circumstances of Glace's death in the early morning hours of June 17, 2007. The court found that Glace was discovered murdered in her car, execution style, and that, according to the medical examiner, she had died from multiple gunshot wounds. As to the details of her murder, the car was located in the driveway near the rear of her home, and it appeared that she was returning to or leaving the premises. The court further found that the perpetrator was at close range, was standing over Glace at the time of the shooting and appeared to be lying in wait for her. Because the detectives who were at the scene found no signs of an attempted robbery, sexual assault or attempted sexual assault and no other apparent motive for the shooting, the court opined that the defendant was the only person who would have benefited from Glace's demise.
The court finally discussed the four transcribed conversations between the defendant and his brother during telephone calls made by the defendant from the correctional facility and recorded with his knowledge. The court found that three of the calls were made in July, 2005, and one call was made on June 2, 2007, the day after the defendant appeared in court and was told that the parties should prepare for trial. The conversations were in a Jamaican dialect and transcribed by a Jamaican born police officer from the Hartford police department who was not a certified court interpreter but had grown up speaking the dialect and continued to speak it on a daily basis. Although the court did not deem the conversations highly persuasive, it found that the defendant was speaking in code because he knew the calls were being recorded and that, in one of his July calls, he had made clear to his brother that no one was to talk about any of these things, which was consistent with the mindset of a person who did not want to get caught and punished.
"[T]he trial court has broad discretion in ruling on the admissibility ... of evidence.... The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion.... We will make every reasonable presumption in favor of upholding the trial court's ruling ... and ... upset it [only] for a manifest abuse of discretion." (Internal quotation marks omitted.) State v. Garcia, 299 Conn. 39, 56-57, 7 A.3d 355 (2010). With respect to *619 the burden of proof, "[t]he fair preponderance standard requires that the evidence [induce] in the mind of the trier a reasonable belief that it is more probable than otherwise that the fact in issue is true." (Internal quotation marks omitted.) State v. Davis, 229 Conn. 285, 291, 641 A.2d 370 (1994). We thus examine the record to determine whether the trial court properly acted within its broad discretion in finding it more probable than not that the defendant was complicit in the murder of Glace for the purpose of procuring her absence and rendering her unavailable to testify.
Having examined the record, we conclude that the trial court did not abuse its discretion in finding that the state had proven, by a preponderance of the evidence, that the defendant rendered Glace unavailable to testify. The defendant's incriminating comments to Nelson, his contacts with his brother, the timing of the murder following the state's decision to prosecute, the circumstances surrounding the murder, the encoded telephone conversations between the defendant and his brother, and the fact that the defendant was the only person to benefit from Glace's death could have induced a reasonable belief in the mind of the trier that it was more probable than not that the defendant intentionally procured her unavailability at trial by arranging for her murder.
The defendant specifically attacks the testimony of Nelson, claiming that he came forward belatedly hoping to receive a reduction in his fifty-five year sentence, that the testimony of a jailhouse informant is inherently unreliable and that his alleged conversations with the defendant should be disregarded because they were not trustworthy. We reject these claims.
The following additional facts are relevant to our analysis of this issue. Although the court noted Nelson's testimony that he had known the defendant for several years but was closer to the defendant's brother, it also noted that Nelson and the defendant were housed in the same cell block, were located on the same level, ate meals together, were involved in recreational activities together and became "reasonably close to each other" for a period of approximately two months in the fall of 2005 when the defendant made the incriminating statements. The trial court also observed that Nelson had not come forward immediately upon hearing this information in 2005, but only two years later, after he had been convicted of several crimes and sentenced to a prison term of fifty-five years. The court acknowledged that Nelson hoped to derive a benefit from his cooperation and had a motive to fabricate. It nonetheless found him credible upon viewing his demeanor in court and because Nelson knew certain details regarding the shooting that he would not have been expected to know unless he had spoken with the defendant about the fight.[6] These details included that the incident at the bar had started because someone stepped on someone else's foot, which was consistent with Glace's statement that "the incident started over a guy named Marcel having his foot stepped on by another guy named Sammy."
"It is well established that [i]t is within the province of the trial court, when sitting as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence.... Credibility must be assessed... not by reading the cold printed record... but by observing firsthand the witness' conduct, demeanor and attitude.... An appellate court must defer to the trier of *620 fact's assessment of credibility because [i]t is the [fact finder] ... [who has] an opportunity to observe the demeanor of the witnesses and the parties; thus [the fact finder] is best able to judge the credibility of the witnesses and to draw necessary inferences therefrom." (Internal quotation marks omitted.) State v. Lawrence, supra, 282 Conn. at 155, 920 A.2d 236.
Insofar as the defendant challenges Nelson's testimony as unreliable because Nelson was a jailhouse informant, the trial court expressly acknowledged that it was "undeniable that ... Nelson hoped to derive a benefit and, hopefully ... a significant benefit, from his cooperation in this matter," and that Nelson had a motive to fabricate in light of his lengthy prison sentence. Nevertheless, the trial court was entitled to find, and did find, on the basis of Nelson's in-court demeanor, that his testimony was for the most part credible, and we must defer to that assessment.
The defendant also claims that his statements against penal interest to Nelson should not have been admitted because they did not satisfy the three-pronged test for trustworthiness set forth in § 8-6(4) of the Connecticut Code of Evidence. The rules of evidence provide for the admission of "[a] trustworthy statement against penal interest that, at the time of its making, so far tended to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. In determining the trustworthiness of a statement against penal interest, the court shall consider (A) the time the statement was made and the person to whom the statement was made, (B) the existence of corroborating evidence in the case, and (C) the extent to which the statement was against the declarant's penal interest." Conn.Code Evid. § 8-6(4). The defendant specifically claims that his incriminating statements were untrustworthy (1) under the first part of the test because Nelson's "acquaintance" with the defendant and his brother was "tenuous," and Nelson did not seem like the sort of person in whom the defendant would have confided his alleged plans to kill Glace, (2) under the second part of the test because Nelson's story was incorrect and did not contain any verifiable information that was not readily available from the newspapers or local gossip, and (3) under the third part of the test because the defendant would not be so unwise as to confess his intent to kill Glace to an acquaintance in two brief conversations. We are unpersuaded.
The trial court's findings that the defendant and Nelson were "reasonably close" in 2005 when the defendant made the incriminating statements and that the defendant actually made the statements were based on its determination that Nelson's testimony was credible, and, as previously discussed, we must defer to the trial court's credibility determinations because it is in the best position to make such judgments. The defendant's claim that Nelson's story was incorrect and that Nelson was not a credible witness because he testified that the defendant had told him that the fight started when he stepped on Marcel's shoes, whereas every other witness who had observed the start of the fight testified that it started when Drummond stepped on Marcel's foot, is of little consequence. The trial court did not focus on this detail of Nelson's testimony but on the more general fact that Nelson knew the fight started because someone had stepped on someone else's foot, information that he would not have acquired unless he had heard it from the defendant. Accordingly, the defendant's claims have no merit.[7]

*621 III
The defendant's last claim is that the trial court abused its discretion in ruling, sua sponte, that evidence that the defendant was involved in Glace's death was admissible to show consciousness of guilt. The defendant argues that the admission of the evidence for this purpose, when he was not on trial for Glace's murder, is virtually unprecedented in the law, is qualitatively different from testimony about threats to a witness and was more prejudicial than probative. The state responds that the defendant's evidentiary claim is unpreserved, and thus unreviewable, because he failed to object at trial on the ground that the evidence was overly prejudicial and did not argue that its admission should be limited in some fashion. The state further contends that, if this court determines that the claim is reviewable, the trial court properly exercised its discretion in admitting the evidence. We conclude that the claim is reviewable and that, even if the trial court improperly admitted the evidence, the impropriety was harmless.[8]

A
We begin with the state's contention that the claim is unpreserved, which requires us to consider the following relevant facts. The question of whether evidence relating to Glace's murder was admissible to show consciousness of guilt was not raised during defense counsel's argument opposing the state's pretrial motion to admit Glace's statement to the police that the defendant was the shooter. The pretrial motion was limited to whether the court should apply the preponderance standard or the clear and convincing standard to its factual determinations regarding the defendant's complicity in the murder, which was essential to its decision as to whether the statement should be admitted. Thus, when the court first addressed the question, it did so, sua sponte, in its decision on the motion. After finding that Glace's statement was reliable, the court discussed whether the facts surrounding her murder were admissible to show consciousness of guilt. Although the court did not explicitly refer to consciousness of guilt, it implicitly discussed the concept *622 when it stated: "[D]oes the probative value of this information outweigh the prejudicial value? And I suppose, to some extent, this may anticipate the issue of whether ... Nelson will be called before the jury. The general rule is that evidence of uncharged misconduct is not admissible. However, an exception for that, as indicated in [State v.] Henry [supra, 76 Conn.App. 515, 820 A.2d 1076], is to allow for the admission of evidence which shows, through misconduct, an intent to obstruct justice or avoid punishment for the crime charged.
"I find, notwithstanding the fact that the allegations regarding [the murder of] Glace are serious, that they are highly probative of the evidence in this case regarding the defendant's intentions and his state of mind. So I do believe that, while there is some prejudice, it is outweighed by the probative value of the information which has been presented. And whatever prejudice there is will be addressed by an appropriate limiting instruction." Neither party objected to the trial court's statement of the law and its intent to admit evidence pertaining to Glace's murder with an appropriate limiting instruction.
On the fourth day of trial, after the court modified its earlier ruling to admit Glace's statement, it again discussed whether evidence concerning her murder should be admitted to show consciousness of guilt. It then engaged in a colloquy with defense counsel on the admissibility of evidence for such a purpose, during which defense counsel objected at least twice.[9]
Thereafter, the court read its proposed instruction regarding the defendant's alleged involvement in Glace's murder. The court stated that it would give a more complete instruction at the end of the trial and asked counsel to refrain from *623 making any comments until Nelson took the stand. Counsel nevertheless suggested that the court add language that the defendant had neither been put on trial nor charged in connection with Glace's murder, and the court agreed to do so.
On the next day of trial, the court explained for the record, outside the presence of the jury, that the parties had just met in chambers to discuss the procedure to be followed that morning in admitting testimony concerning Glace's death and that counsel had agreed that the court would give a preliminary limiting instruction on consciousness of guilt before the start of the testimony. The court then read the proposed instruction, to which counsel for both parties assented.[10] The court next discussed the redacted version of Glace's statement, which was to be offered as an exhibit, and asked defense counsel, "other than your obvious objection to this statement itself, anything  any objection to the redaction that we've done?" Defense counsel replied: "No, Your Honor. I think we have an understanding that I have a standing objection?" The court responded: "You have a standing objection with respect to the overlying issue of whether the statement comes in at all," and defense counsel answered, "[y]es." The court then summoned the jury and gave the limiting instruction before the start of the testimony.
On the last day of trial, the court discussed the proposed jury charge, which had been given to counsel the preceding day, and noted that neither party had taken exception to any of its parts. The court specifically asked counsel: "And based on what I've submitted, [you have] no exception to the charge. Of course, your claims are preserved with respect to the admission of the consciousness of guilt on the issue of ... Glace's killing, correct?" Defense counsel responded in the affirmative. The court then asked, "[o]ther than noting that, any other exceptions to the charge?" Both parties responded, "[n]o sir." Thereafter, the court *624 gave the jury the full limiting instruction on consciousness of guilt.[11]
"It is well settled that [o]ur case law and rules of practice generally limit this court's review to issues that are distinctly raised at trial." (Internal quotation marks omitted.) State v. Hampton, 293 Conn. 435, 442-43, 978 A.2d 1089 (2009); see Practice Book § 60-5. "This court has indicated that the rules requiring that an exception be distinctly raised at trial are not simply formalities.... They serve to alert the trial court to potential error while there is still time for the court to act.... Assigning error to a court's evidentiary rulings on the basis of objections never raised at trial unfairly subjects the judge and the opposing party to trial by ambush." (Citations omitted; internal quotation marks omitted.) Davis v. Margolis, 215 Conn. 408, 414-15 n. 5, 576 A.2d 489 (1990).
We conclude that, although the record is not entirely consistent, defense counsel properly objected to the admission of evidence pertaining to Glace's murder, and, *625 accordingly, the issue of whether the evidence could be admitted for that purpose was preserved for review. Although defense counsel agreed with the court on the fourth day of trial that, under Henry, evidence of an intent to obstruct justice or to avoid punishment for the crime charged may be admitted to show consciousness of guilt, he replied in the affirmative when the court directly asked if he took exception to the court's conclusion in Henry. The trial court also agreed with defense counsel that he had made his objection to testimony regarding Glace's murder known and that the court would view his past argument as "a continuing objection" to Nelson's testimony "about anything relating to the demise of ... Glace and any inferences to be drawn therefrom." On the last day of trial, the court again affirmed, before giving the final jury instructions, that, "[o]f course, your claims are preserved with respect to the admission of the consciousness of guilt on the issue of... Glace's killing, correct?" Defense counsel responded in the affirmative.
We acknowledge that there are other portions of the record that raise questions as to whether defense counsel was objecting at certain times to the admission of Glace's statement[12] or to the admission of evidence regarding Glace's murder to show consciousness of guilt. We conclude, however, that the trial court understood when defense counsel specifically objected on more than one occasion to the admission of evidence regarding Glace's murder.
The state argues that the law required defense counsel to object to the admission of the evidence on the ground that it was unduly prejudicial or that he should have argued that its admission should be limited in some fashion. We disagree. In State v. Fernando A., 294 Conn. 1, 31 n. 26, 981 A.2d 427 (2009), we rejected "a hypertechnical and unduly restrictive application of the rules of preservation...." Moreover, defense counsel clearly objected to the admission of the evidence relating to the murder of Glace as proof of consciousness of guilt. Accordingly, we conclude that our consideration of the issue on appeal will not unfairly subject the judge and the state to trial by ambush. See, e.g., Davis v. Margolis, supra, 215 Conn. at 414-15 n. 5, 576 A.2d 489.

B
The defendant finally claims that the trial court abused its discretion in ruling that the state could introduce evidence that he was involved in Glace's murder to prove his consciousness of guilt. He also claims that admission of the evidence constituted harmful error. Even if we assume, without deciding, that the evidence was unduly prejudicial and thus was improperly admitted, we nevertheless conclude that the defendant was not harmed by introduction of the evidence regarding Glace's murder.
We first note that consciousness of guilt claims are not constitutional in nature. See, e.g., State v. Rowe, 279 Conn. 139, 152, 900 A.2d 1276 (2006). "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful." (Internal quotation marks omitted.) State v. Osimanti, 299 Conn. 1, 16, 6 A.3d 790 (2010). "[A] nonconstitutional [impropriety] is harmless when an appellate court has a fair assurance that the [impropriety] did not substantially affect the verdict." (Internal quotation marks omitted.) State v. Boyd, 295 Conn. 707, 743, 992 A.2d 1071 (2010), *626 cert. denied, ___ U.S. ___, 131 S.Ct. 1474, 179 L.Ed.2d 314 (2011).
In the present case, several factors persuade us that any potential impropriety in admitting evidence directly relating to Glace's murder had no substantial effect on the verdict. First, there was a great deal of other evidence indicating that the defendant was the person who shot the victims in the present case. In addition to Glace's identification of the defendant in her statement to the police, the jury heard the testimony of six other witnesses who were present at or near the shooting and who identified the defendant as being at the scene. See footnote 2 of this opinion. These included: Fair, a patron at the bar who was injured by one of the shots fired by the perpetrator and who identified the shooter as the person who fought with Marcel; Barrington, who identified the defendant as the shooter; Caliphah Baltimore, Robinson's girlfriend and a patron who was leaving the premises at the time and who identified the defendant as the person running from the bar after the shooting with a gun in his hand; Saunders, who identified the defendant as the person reentering the bar with a gun in his hand after the original fight; Paulette Shelton, a friend of Hollywood's who identified the defendant as the shooter and observed him run out of the bar after the shooting and remove the license plate from his Infiniti;[13] and Castellani, who identified the defendant as the person taking the gun from the Infiniti moments before the shooting and returning to the vehicle and leaving drops of blood on the bumper after the shooting.
Second, other evidence that was admitted showed the defendant's consciousness of guilt, including the defendant's use of his brother's name when he sought treatment at a hospital in Meriden for injuries he sustained during the fight, and his flight to Jamaica the following day.
Third, the court gave two limiting instructions regarding the evidence, one before the jury heard the evidence of Glace's murder and another at the conclusion of the trial. In both instructions, the court cautioned the jury that the evidence was not intended to demonstrate the character or propensity of the defendant, that the defendant had not been charged with any offense in connection with the death of Glace and that a finding that the defendant had directed, assisted or otherwise promoted the killing of Glace was not conclusive and created no legal presumption of guilt but reflected a guilty conscience relating to the crimes charged. The court also stated that, although the jury was permitted to make the inference of a guilty conscience, it was not required to do so on the basis of the evidence, and that any evidence of the defendant's conduct in connection with the murder of Glace should be given only the weight to which the jurors deemed it entitled under the circumstances. Accordingly, we conclude that the harmless error standard has been satisfied because there is a fair assurance that the trial court's decision to admit the testimony regarding Glace's murder to show the defendant's consciousness of guilt, even if improper, did not substantially affect the verdict.
The defendant argues, inter alia, that the error was harmful because most of the witnesses did not make a contemporaneous identification, only one witness mentioned that the defendant was bleeding after the fight, the evidence regarding his treatment *627 at the hospital and his flight to Jamaica was weak, and a curative instruction is not always sufficient to overcome the prejudicial impact of such evidence. We disagree because the cumulative effect of the factors discussed was more than sufficient to overcome the potential weakness of any one factor.
The judgment is affirmed.
In this opinion the other justices concurred.
NOTES
[1] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...."

The constitution of Connecticut, article first, § 8, provides in relevant part: "In all criminal prosecutions, the accused shall have a right ... to be confronted by the witnesses against him...."
[2] Fair identified the shooter as the person who fought with Marcel, Barrington identified the defendant as the shooter, Caliphah Baltimore, Robinson's girlfriend and a bar patron who was leaving around the time of the shooting, identified the defendant as the person running from the bar after the shooting with a gun in his hand, Saunders identified the defendant as the person reentering the bar after the fight with a gun in his hand, Paulette Shelton, a friend of Hollywood's, identified the defendant as the shooter, and Castellani identified the defendant as arming himself with a gun that he retrieved from his car moments before the shooting and returning to the vehicle and leaving blood droplets on the bumper after the shooting.
[3] Section 8-6 of the Connecticut Code of Evidence provides in relevant part: "The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

* * *
"(8) Forfeiture by Wrongdoing. A statement offered against a party who has engaged in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness."
[4] The court found as follows on the issue of reliability: "I find that the statement was written, it was signed by [Glace], it was sworn to by her, it's relatively contemporaneous with the event that had just occurred. It was taken the morning of the incident at [police headquarters] within a matter of hours after it occurred. It is a detailed statement. It is a statement which flows logically. There's  it's not disjointed, and there is no evidence that I am aware of any apparent motive for [Glace] to lie. Therefore, I find under the circumstances that it has sufficient indicia of reliability."

The court also found that the statement was "highly probative of the evidence in this case regarding the defendant's intentions and his state of mind. So I do believe that, while there is some prejudice, it is outweighed by the probative value of the information which has been presented. And whatever prejudice there is will be addressed by an appropriate limiting instruction."
[5] Some states have not specified the standard to be followed by the trial court in making the required preliminary factual determination. See, e.g., Boyd v. State, 866 N.E.2d 855, 857-58 (Ind.App.), transfer denied, 878 N.E.2d 208 (Ind.2007); Crawford v. Commonwealth, 55 Va.App. 457, 472-74, 686 S.E.2d 557 (2009), aff'd, 281 Va. 84, 704 S.E.2d 107 (2011); Proffit v. State, 191 P.3d 963, 967 (Wyo.2008), cert. denied, 555 U.S. 1157, 129 S.Ct. 1048, 173 L.Ed.2d 476 (2009).
[6] The court noted Nelson's testimony that he had not been provided with any facts about the case other than those that he had heard from the defendant.
[7] The defendant also claims that the trial court abused its discretion in relying on the testimony of Detective Christopher Sullivan, a member of the Hartford police department, who gave a "hearsay summary of his investigation and of the findings of the medical examiner and the state's firearms examiner," and in relying on Sullivan's conclusion that the defendant and his brother were the only persons of interest in Glace's murder. Although it appears that the trial court did rely on this testimony in considering the circumstances connected with the murder, without specific attribution to Sullivan, the defendant's argument fails for two reasons. First, the defendant concedes that he did not object to the admission of this evidence at trial, and it is well established that, when hearsay is admitted without objection, it is a sufficient basis, if believed by the trier, for a finding of fact. See, e.g., State v. Carey, 228 Conn. 487, 495-96, 636 A.2d 840 (1994). Second, the defendant expressly recognized in his brief to this court that trial counsel may have chosen not to object for strategic reasons because "he risked opening the door to the state offering yet more testimony and exhibits in support of its claim that [the defendant] was involved in Glace's murder with little benefit as ... the trial court determined [the defendant's] involvement by a preponderance standard, and, at trial, the evidence had already been determined to be admissible  calling further attention to it would [have been] counterproductive." The defendant's argument is therefore unpersuasive.
[8] Whether evidence relating to the reasons for the unavailability of a witness should be admitted at trial to show consciousness of guilt, especially in the absence of a request by either party, as in the present case, is a very close question and an issue of first impression in Connecticut. We leave that question for another day, however, in light of our harmless error analysis.
[9] "The Court: All right. And I've already admitted [Nelson's] testimony insofar as it creates a foundation for the admissibility of the Glace statement. I think the case law is clear that, once I've made that decision, the issue of that type of conduct becomes fodder for consciousness of guilt, at least if you read Henry. I know you probably may not [agree] with my assessment of the admissibility of this statement or my views of credibility regarding... Nelson. Is there any disagreement that Henry says that this would be consciousness of guilt evidence?

"[Defense Counsel]: That's what Henry says. I would agree with that, yes.
"The Court: Do you take exception to it?
"[Defense Counsel]: Well, yes.
"The Court: All right. What I'm [going to] do is, I'll  before Mr. Nelson testifies  I suppose we should argue that objection rather than having the jury in and out.
"[Defense Counsel]: Judge, any argument I would make now I've already made, and you've ruled.
"The Court: Okay.
"[Defense Counsel]: Clearly, there's a record of what my objection would be. I could simply object to his 
"The Court: Fine.
"[Defense Counsel]:  testimony and refer to the argument that I've made in the evidentiary hearing.
"The Court: I will give you that objection now, then, and I will indicate that you, for purposes of continuity, you need not object unless you want to, in front of the jury. You need not object at the trial. It will be preserved with respect to that issue.
"[Defense Counsel]: I would think there's a full understanding. There's no need for me to resuscitate or regurgitate everything that's already been said.
"The Court: I agree. I agree with that, and I'll view that as a continuing objection to his testimony about anything relating to the demise of ... Glace and any inferences to be drawn therefrom. I do not want to give the full consciousness of guilt instruction to the jury when [Nelson] testifies. However, I do want to say something about the statement. So, I've written something, and I'll read it to you ... to see what you think, and we can, again, modulate this as we need to."
[10] The court read the following instruction for counsel: "Ladies and gentlemen of the jury, I need to instruct you with respect to evidence you have heard and will hear more about. The evidence you have heard involved a witness named Asher Glace, who allegedly gave a statement to [police] and was allegedly the subject of a discussion between ... Nelson and the defendant. You will be hearing further testimony from this point forward regarding the circumstances of the death of ... Glace. It is the state's contention that the defendant was involved in bringing about her death for the purpose of preventing her from testifying.

"I start by telling you that this evidence is neither offered nor admitted for the purpose of demonstrating the character or any propensity of the defendant. I also instruct you that the defendant is not on trial before you for his alleged involvement in the death of ... Glace, nor has he been charged with any offense regarding such alleged involvement. The sole purpose for which this evidence is being admitted is a concept known as consciousness of guilt. I will give you a more complete instruction on that concept in my final instructions of law at the conclusion of this case, before you commence your deliberations.
"For present purposes, I advise you that it is the state's contention that the defendant participated or was complicit in procuring... Glace's death for the specific purpose of preventing her from testifying as a witness in this case. If you find this to be the case, the state claims that such actions reflect a consciousness of guilt with respect to the charges presently before you, and you may draw such inferences in that regard as you deem to be reasonable.
* * *
"The Court: Okay. Is that okay with everybody?
"[Senior Assistant State's Attorney]: Yes, sir.
"The Court: Defense?
"[Defense Counsel]: That's fine, Your Honor.
"The Court: All right."
[11] "The Court: ... Evidence admitted for a limited purpose. You will recall that I have ruled that some testimony and evidence have been allowed for a limited purpose. Any testimony or evidence which I identified as being limited to a purpose, you will consider only as it relates to the limits for which it was allowed, and you shall not consider such testimony and evidence in finding any other facts as to any other issue.

305 Conn. 412
"Consciousness of guilt. In any criminal trial, it is permissible for the state to show that conduct or statements made by a defendant after the time of the alleged offense may have been influenced by the criminal act, that is, the conduct or statements show a consciousness of guilt. Such acts or statements do now, however, raise a presumption of guilt. If you find the evidence proved and also find that the acts or statements were influenced by the criminal acts and not by any other reason, you may, but are not required to, infer from this evidence that the defendant was acting from a guilty conscience.
"The state claims the following conduct is evidence of consciousness of guilt:
305 Conn. 412
"The state claims that the defendant, with the assistance of others, attempted to and did procure the unavailability of a witness with the intention of preventing her from testifying at the trial on the charges before you. Specifically, the state claims that this contention is supported by the evidence you heard regarding the defendant's alleged stated intention to kill any witnesses against him and the subsequent evidence you heard regarding the circumstances surrounding the death of ... Glace. I remind you again that the defendant is not charged with that crime, and, thus, you are not to render a verdict on that allegation. I permitted the state to offer evidence regarding the death of ... Glace only on the issue of consciousness of guilt. Before you can consider such conduct as consciousness of guilt, you must first find that the conduct of the defendant, as alleged, has been proven. It is for you to decide what that conduct was and what the defendant's purpose and reason [were] for acting as he did. If you find that the defendant did, in fact, direct, assist or otherwise promote the killing of ... Glace, then you must consider whether this act reflects a guilty conscience relating to the crimes charged in this case. Such a finding is not conclusive, nor does it create a legal presumption of guilt. It does not necessarily follow that murder flows from a guilty conscience. It is an inference that you are permitted... but are not required to draw. You should consider such conduct as you find to have taken place in connection with all of the other evidence in this case and give it such weight to which you think it is entitled under the circumstances.
"Before you can consider any of this conduct as consciousness of guilt, you must first find that the conduct occurred. It is for you, as the jury, to decide, as a question of fact, what that conduct was and what the defendant's purpose and reason [were] for acting as he did. If you determine that any of the... facts that have been alleged by the state have been proven, again, you may but are not required to infer from such facts that the defendant was acting from a guilty conscience and [you] may consider such in your deliberations in conformity with these instructions."
[12] We specifically refer to the court's discussion, on the fifth day of trial, regarding defense counsel's "standing objection" to the admission of Glace's statement to the police.
[13] Barrington and Shelton, neither of whom identified the defendant as the shooter in the immediate aftermath of the crime, testified that they did not identify the defendant earlier because they were afraid for their safety.