******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## RAMON LOPEZ *v.* WARDEN*

Superior Court, Judicial District of Tollxand
File No. CV-12-4004836-S

Memorandum filed May 1, 2019

*Proceedings*

Memorandum of decision on amended petition for writ of habeas corpus. *Petition denied.*

*Michael W. Brown and Joshua Grubaugh*, for the petitioner.

*Emily D. Trudeau*, assistant state's attorney, for the respondent.

*Opinion*

SFERRAZZA, J. The plaintiff, Ramon Lopez, seeks habeas corpus relief from a total, effective sentence of 100 years of imprisonment, imposed after a jury trial, for the crimes of murder, two counts of attempted murder, and two counts of assault in the first degree. Our Supreme Court affirmed the judgment of conviction on direct appeal. *State* v. *Lopez*, 280 Conn. 779, 911 A.2d 779 (2007).

The petitioner filed a previous habeas action attacking the effectiveness of his criminal defense counsel, Attorney Lawrence Hopkins. For sentencing, Attorney Robert Berke replaced Attorney Hopkins, and Attorney Berke's representation was not the subject of the first habeas case. On January 4, 2012, Judge Fuger denied habeas corpus relief. *Lopez* v. *Commissioner of Correction*, Superior Court, judicial district of Tolland, Docket No. CV-05-4000857-S (January 4, 2012). The Appellate Court affirmed that decision, per curiam. *Lopez* v. *Commissioner of Correction*, 150 Conn. App. 905, 93 A.3d 181, cert. denied, 314 Conn. 922, 100 A.3d 853 (2014).

In the present case, the petitioner pursues claims of ineffective assistance of defense counsel and previous habeas counsel, Attorneys Thomas P. Mullany III and David Rozwaski; a *Brady* violation; see *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); and a claim of actual innocence. Other grounds for relief were previously dismissed or have not been pursued and are deemed abandoned.

Because of the unusually complicated factual circumstances and scenarios presented by the evidence and the complex legal issues propounded, the court has permitted oversized briefs and granted numerous extensions of time to file such briefs. The petitioner's counsel has described the potential factual and legal issues as "numerous, complicated, [and] wide-ranging." Counsel has also noted that the record is "fairly voluminous" and acknowledged that the petitioner's third-party culpability theory is "at first counterintuitive . . . ." These observations appear apposite.

The court has reviewed the evidence in this case in great detail, including transcripts of the criminal trial and the first habeas case and police investigation and interview reports pertaining to multiple incidents. In order to set the stage properly and promote a fuller understanding of the factual and legal questions to be resolved, the court adopts a somewhat peculiar format in this memorandum and hopes that these aspirations can be attained.

First, the court provides a nonexhaustive glossary of names, aliases, and sobriquets to facilitate a comprehensive explanation of the several relationships, locations, and events that are pertinent to the court's deci-

sion.

The petitioner: Ramon Lopez, a/k/a "Buttafuco."

The Pettway store: Located at the northwest corner of the intersection of Stratford Avenue and Fifth Street in Bridgeport. It is variously referred to as an all-night convenience store, a liquor store, and a grocery store.

Manual Rosado: a/k/a Kevin Anderson and "Cricket." One of the shooting victims in the Pettway store incident of February 2, 2002.

Shariff Hakeem-Abdul: a/k/a "Polo" and Lonnie Rosado. The deceased victim of the Pettway store shooting and brother of Manual Rosado.

Robert Payton (now deceased): "Rob." A friend of Manual Rosado, brother of Tony Payton, and cousin to Brad Rainey.

Tony Payton: "Tone" or "Tonny." Brother of Robert Payton and a purported witness to the Pettway store shooting of February 2, 2002. Walks with a pronounced limp.

Gary Burton: Another shooting victim of the Pettway store shooting and acquaintance of Robert Payton.

John Dawson: Purported witness to the February 2, 2002 shooting and/or aftermath.

Eddie Hilton: Purported witness to the February 2, 2002 shooting and/or aftermath.

Desiree Jones: Friend of Gary Burton and purported witness to his shooting and/or aftermath.

Keaga Johnson: Friend of Gary Burton and purported witness to his shooting and/or aftermath.

Francisco Soares: "Cisco." An acquaintance of Gary Burton and purported witness to his shooting and/or aftermath.

Kenny Soares: Brother of Francisco Soares and acquaintance of Gary Burton.

John Soares: "Jay"; "Big Jay." Acquaintance of Gary Burton and cousin to Francisco Soares and purported witness to his shooting.

John Santos: "Little Jay." Acquaintance of Gary Burton.

Michael Lockhart: a/k/a Michael Pettway; "Chef." Possibly one of the gunmen at the February 2, 2002 shooting.

Bernie Gethers: "Tank."

Lou Diamond: Possible a/k/a Troy Lopez. Alleged companion to Chef at Pettway store on February 2, 2002, and possible gunman.

Tajah McClain: "Kaiser"; "Kiser"; "Boo." Possible gunman at Pettway store shooting. Walks with a limp.

April Edwards: A close friend of Tony Payton and potential witness to the February 2, 2002 shooting, but never called to testify in criminal case or either habeas cases.

Michael Jackson: Purported witness to February 2, 2002 shooting and/or aftermath.

Bob Kapel (Capel): Purported witness to February 2, 2002 shooting and/or aftermath.

Jose Rivera: "Tweety." Possible associate of the petitioner.

"Pooh" or "Phoo": Possibly present at February 2, 2002 shooting.

Vincent Wilson: "Fato"; "Fatol." Brad Rainey's brother-in-law.

Brad Rainey: Possibly a/k/a Brad Payton. Cousin of Robert and Tony Payton.

Donna Jones: Purportedly heard February 2, 2002 shooting. Acquaintance of Manual Rosado.

"Weesa": Female acquaintance of Robert Payton and the petitioner.

Irell Pettway: "Country."

P.T. Barnum Apartments: Housing facility on Anthony Street, Bridgeport.

Jerry Kollock: Convicted of January 27, 2002 home invasion at Colbert apartment at P.T. Barnum complex. Companion to Randy Armstrong.

Keisha Bowles: Kollock's girlfriend.

Randy Armstrong: "Little Biscuit"; "L B." Friend of Kollock, "Fato," and Brad Rainey. Shot in the foot on January 24, 2002, at Greens housing complex. Allegedly shot accidently by the petitioner.

Nakina Goff: Randy Armstrong's girlfriend.

Barbie Colbert: Victim of P.T. Barnum home invasion of January 27, 2002.

Davis Brown: Another victim at Colbert apartment.

Latosha DelGiudice: "Natasha"; "Tosha"; Tasha." Brad Rainey's girlfriend and Shayla DelGiudice's sister.

Lakisha Banks: Friend of Kollock.

Kiva Scutter: "Aunt Kiva." Colbert's neighbor.

Shonda Upchurch: Sister of Vincent Wilson and go-between/mediator for disputants at P.T. Barnum housing complex.

Javen Eagles: "Rat." Drifter and friend of Colbert.

Cedelice Davis: Brad Rainey's friend.

Fifi: Brad Rainey's cousin.

Marcus Mahoney: Caucasian friend of "Polo." Like a brother to Polo and possible partner in illicit drug business with him.

The court now describes the potential evidence as to three incidents from which one can reasonably glean the following details. These putative facts are derived from police investigative notes and reports, hearsay statements contained therein, as well as evidence introduced at the petitioner's criminal trial and earlier habeas trial. Consideration of information included, or logically deducible, from these sources is necessary because the petitioner's *Brady* violation claims, as well as the ineffective assistance allegations, require scrutiny of the information reasonably available to any of the petitioner's counsel and/or imputable to the prosecuting authority.

### RANDY ARMSTRONG SHOOTING

During the early hours of January 25, 2002, Armstrong was shot in the foot. His companion, Jerry Kollock, initially drove Armstrong for medical care, but they decided to stop at Armstrong's sister's home first. After she refused to join them on the trip to the hospital, Kollock and Armstrong drove to the home of Armstrong's girlfriend, Nakina Goff. Goff agreed to accompany them to the hospital.

When initially questioned by the police regarding how the injury occurred, Armstrong and Goff related a fictitious tale that the couple had just left Goff's residence on foot when unidentified gunmen emerged from a car and attempted to rob them. They stated the robbers forced Armstrong to lie on the ground. When the robbers ascertained that Armstrong had no money, they returned to their vehicle. Before departing, however, the assailants fired a shot that struck Armstrong in the foot.

Armstrong and Goff fabricated this scenario because both Armstrong and Kollock were on parole and had traveled beyond the geographic limits specified by the parole conditions. Because Goff's apartment was closer to the area permitted by the terms of their parole, Armstrong and Kollock hoped that such a minor transgression would be overlooked.

Eventually, Goff told the police a different, and presumably truer, story. Armstrong and Kollock had visited the Greens housing complex, where Kollock and others drank and ingested drugs. While intoxicated, some members of the group exuberantly fired guns in the air. Armstrong told Goff that, as a consequence, the petitioner had accidently shot him.

Armstrong left the hospital during the afternoon of that same day, January 25, 2002. He used a cane to facilitate walking.

At around 2 o'clock that afternoon, Kollock's girl-

friend, Keisha Bowles, drove Kollock and Armstrong to Goff's home. Later, Bowles and Kollock returned to pick up Armstrong so that Kollock and Armstrong could meet with their parole officers. After these appointments concluded, Bowles and Kollock dropped Armstrong off at his home.

The next day, January 26, 2002, at around 1 p.m., Armstrong and Goff argued, and Goff left from Armstrong's home to go to her own residence. Later that day, they reconciled, and she and Armstrong talked, by phone, through the night.

The following day, January 27, 2002, at around 8 a.m., Bowles arrived at Goff's home looking for Kollock. Bowles thought Armstrong might know of Kollock's whereabouts. Bowles told Goff that Kollock had taken her car the night before, never returned, and that she received a phone call from Latosha DelGiudice, the girlfriend of Brad Rainey, that Bowles' car was stranded in the East End section of Bridgeport.

When Bowles went to retrieve her car, she found that it was unlocked, the keys were missing, and the tires had been flattened. She sought out Kollock and wanted Armstrong to assist her in that endeavor. Goff called Armstrong, but Armstrong's sister answered and told Goff that Armstrong was asleep and that she had not seen Kollock.

Goff asserted that she spent the evening of January 26 to 27, 2002, at Armstrong's residence and returned to her own home around 8 a.m. that morning.

### P.T. BARNUM HOME INVASION

About two hours earlier, around 6 a.m. on January 27, 2002, Barbie Colbert was asleep in her residence, which was Apartment 108 of the P.T. Barnum Apartments. Sleeping in her bed with her were three of her children, ages seven, five, and four years. Colbert's thirteen year old son was asleep on a couch in the living room, and her seventeen year old stepdaughter slept in another bedroom. Another relative, Davis Brown, was watching television in the living room.

Earlier that morning, a neighbor, Kiva Scutter, visited Colbert's apartment and had awakened Brown. Scutter then left and announced that she expected to return shortly. When she exited Colbert's apartment, she left the front door to that apartment unlocked.

Suddenly, two armed men rushed into Colbert's apartment and demanded money. Brown recognized Jerry Kollock as one of the robbers. Brown knew Kollock's family. Brown believed that the second gunman was Randy Armstrong. Both gunmen had concealed their lower faces with masks or clothing, and Kollock shoved a semiautomatic pistol into Brown's mouth while ordering Brown to take the gunmen into Colbert's bedroom to awaken her. Brown complied.

At first, Colbert assumes Brown was joking when he roused her with the news that armed men wanted to rob them. The gunmen forced Brown onto Colbert's bed. They compelled Brown and Colbert to refrain from looking at them. Kollock struck Brown in the head four or five times, causing Brown to bleed profusely. Colbert produced a pillowcase containing $180 and offered it to the robbers. Kollock told his accomplice to search the apartment, and his companion ransacked the residence. The robbers also inquired about the whereabouts of "Rat," Vincent Wilson.

When the gunmen first accosted Brown in the living room, Colbert's thirteen year old son awakened and arose. Kollock pointed his weapon at the boy and directed him to remain still. The boy froze, but he was in position to observe the entire episode.

One of the younger children in Colbert's bed warned, "Mommy don't move! They have guns!" As a result of the pistol-whipping of Brown and fear for their lives, Colbert screamed.

The scream and commotion brought Colbert's seventeen year old stepdaughter out of her bedroom and to the doorway of Colbert's bedroom. The girl tried to flee, and the gunmen pursued her. She tripped and fell, and Kollock's companion pushed his pistol into her mouth and then pressed it forcibly into her eye.

While so subjugated, Kollock reached underneath the teenager's underwear and probed her vagina, possibly searching for concealed drugs.

At that time, Colbert's five year old daughter ran from the bedroom toward the kitchen. She hid under a kitchen table. Kollock demanded she come out, but she bravely refused.

A third accomplice, identified by Brown as Brad Rainey, entered the apartment and urged Kollock and the other gunman to leave. Kollock or his companion then fired a shot toward the kitchen table. The bullet struck a cabinet about three feet from the table. The three intruders then exited.

Brown and the thirteen year old ran to a window and saw two cars quickly drive out of parking spaces directly in front of Colbert's apartment. Brown recognized one vehicle as belonging to Kollock's girlfriend, Bowles.

Both Colbert and her thirteen year old son also recognized Kollock. Colbert occasionally braided customers' hair, and Kollock had sought such services just a few weeks before the incident.

Kollock learned that the police suspected him to be one of the gunmen. He disposed his pistol and went underground. The police eventually captured him.

PETTWAY STORE SHOOTING

Our Supreme Court described the evidentiary scaffold that supported the jury's guilty verdicts as follows:

"In the early morning hours of February 2, 2002, several people were gathered inside and outside of Pettway's Variety Store (Pettway's) at the northwest corner of the intersection of Stratford Avenue and Fifth Street in Bridgeport. Stratford Avenue runs in a generally east-west direction and has one-way traffic heading east. Fifth Street runs in a generally north-south direction and ends at Stratford Avenue. The three victims, Shariff Abdul-Hakeem, also known as "Polo," his brother, Manuel Rosado, and Gary Burton, were standing outside the store. Lou Diamond and a man known as "Chef" came out of Pettway's, gave Abdul-Hakeem and Rosado a "grim" look and then walked north on Fifth Street. Shortly thereafter, Diamond and Chef, who had covered the lower parts of their faces with some type of cloths, turned around and walked back down Fifth Street toward Pettway's. At the same time, a third unidentified person carrying a gun ran from the east side of Fifth Street to the west side and joined Diamond and Chef.

Meanwhile, a white car had come down Fourth Street, the next street to the west of Fifth Street, turned east onto Stratford Avenue and stopped on the north side of that street. Two men got out of the rear driver's side door and the car then crossed Stratford Avenue and parked on the south side of the street. Although two men wore cloths over their lower faces, an eyewitness, Tony Payton, knew both men and was able to identify them as Boo McClain and the [petitioner]. McClain carried a handgun and the [petitioner] carried a shotgun. As McClain and the [petitioner] approached Pettway's, the [petitioner] said to the people gathered on the sidewalk, "All right freeze, nobody move," and he cocked the shotgun. The people on the sidewalk then rushed toward and started banging on the door to Pettway's, which had a "buzzer lock." The door opened and several people were able to get inside the store. Rosado, who was standing outside the store facing Fifth Street, turned toward Fourth Street to see the reason for the commotion. He saw the [petitioner], whom he had known for about one year before the shooting and with whom he had been incarcerated, aiming a gun at him. As Rosado dove for the door to Pettway's, McClain, the [petitioner] and the three men who were approaching Pettway's down Fifth Street opened fire on the crowd. After the shooting, the [petitioner] yelled, "I told you I was going to get you, Polo, I told you I was going to get you." McClain and the [petitioner] then ran back up Stratford Avenue and reentered the white car, which turned around and sped back up Fourth Street. At the same time, Diamond and Chef ran back up Fifth Street. A later ballistics analysis revealed that two separate shotguns and four separate handguns had been used in the shooting.

"Abdul-Hakeem received bullet wounds in his left calf and left buttock. The bullet that hit his left buttock exited from the right side of his abdomen, and Abdul-Hakeem died several hours after the shooting as the result of uncontrollable bleeding from the wound. Rosado received shotgun wounds to his legs. Burton was wounded when a bullet hit him in the ribs and another bullet grazed his hip." *State* v. *Lopez*, supra, 280 Conn. 783–85.

## *BRADY* VIOLATION CLAIMS

In his amended petition, dated July 28, 2017, the petitioner asserts that the prosecution failed to disclose to the defense or otherwise correct false or misleading testimony elicited from state's witnesses Tony Payton and Manual Rosado; failed to disclose that other suspects in the Pettway store shooting were never prosecuted; and failed to disclose the details acquired by the Bridgeport police regarding the P.T. Barnum home invasion case.

After a hearing, Judge Oliver previously dismissed the *Brady* violation claims premised on nondisclosure of possible consideration given to Manual Rosado with respect to federal charges he once faced in exchange for his cooperation with the state in the state's case against the petitioner.

Also, the petitioner's posttrial brief fails to discuss the same type of claim with respect to Tony Payton's cooperation. Therefore, the court regards that *Brady* violation allegation as abandoned.

There are three components needed to establish a valid *Brady* violation. *Lapointe* v. *Commissioner of Correction*, 316 Conn. 225, 262, 112 A.3d 1 (2015). The undisclosed evidence must be favorable to the accused; it must have been suppressed by the prosecution, wilfully or inadvertently; and "prejudice must have ensued." (Internal quotation marks omitted.) Id. "Prejudice" means that the favorable information withheld "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." (Internal quotation marks omitted.) Id., 262–63.

In determining whether evidence was suppressed, good faith or bad faith is irrelevant. *Demers* v. *State*, 209 Conn. 143, 149, 547 A.2d 28 (1988). The state has the duty to supply to the defense favorable material that is within its possession or control and which the state knew or should have known was exculpatory. Id., 150–51. No request for such evidence is necessary to trigger this duty. Id., 151. Evidence which is within the knowledge of state agencies, including local police departments, is constructively within the state's possession. See *Gonzalez* v. *State Elections Enforcement Commission*, 145 Conn. App. 458, 479, 77 A.3d 790, cert. denied, 310 Conn. 954, 81 A.3d 1181 (2013); see

also *Giglio* v. *United States*, 405 U.S. 150, 154–55, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972).

1

The court declines to treat the prosecutorial decision not to file charges against persons, other than the petitioner, suspected of participating in the same criminal enterprise as an accomplice, accessory, or coconspirator, as exculpatory in this case. To be clear, the petitioner makes no claim that these other persons received favorable treatment in exchange for their cooperation in the investigation and/or prosecution of the Pettway store shootings against the petitioner or anyone else. Nor does the petitioner allege that agents of the state engaged in conduct to render these other individuals unavailable to the defense in his case.

Instead, the petitioner argues that "other perpetrators named by the supposed eyewitnesses of the Pettway's shooting were never seriously investigated by the police." Petitioner's Posttrial Brief, p. 10. This argument appears more in the nature of a tacit recognition by the state that the police investigation of these persons was insufficient or that the prosecution lacked confidence in its eyewitnesses.

The court rejects this type of argument as describing a valid *Brady* violation. The prosecutors' subjective belief in the relative strength or weakness of their case is, standing alone, not exculpatory evidence. Specific information available to the state that prompts that belief may comprise exculpatory evidence, but the exercise of prosecutorial discretion is, in itself, a professional conclusion and not a potentially relevant fact. As such, the *Brady* rule requires no disclosure of that type of charging decision.

Also, it would disserve the ends of justice to employ a doctrine that induces law enforcement agents to arrest and charge persons of crime when the agents feel evidence to prove the crimes, beyond a reasonable doubt, may be lacking. The state ought to be free to decline to charge others of crimes just to avoid claims, such as the petitioner propounds, by one against whom the state did prefer charges.

The executive branch "has broad discretion as to whom to prosecute and what charges to file." *State* v. *Santiago*, 318 Conn. 1, 25, 122 A.3d 1 (2015). "Both the decision to criminally charge an individual and the choice of which crime should be charged lie within the discretion of the state and are not ordinarily subject to judicial review." *Reynolds* v. *Commissioner of Correction*, 321 Conn. 750, 760–61, 140 A.3d 894 (2016), cert. denied sub nom. *Reynolds* v. *Semple*,      U.S.     , 137 S. Ct. 2170, 198 L. Ed. 2d 241 (2017). There is no legal principle "that the state commits misconduct if it chooses *not* to bring the most severe charges possible against a cooperating witness." (Emphasis added.)

Id., 761.

Except for cases where nonprosecution rests on invidiously discriminatory motives, courts should avoid intruding on prosecutorial charging decisions. The petitioner has failed to prove a *Brady* violation based on the absence of charges lodged against other persons who might fall under suspicion based on the same or similar evidence as points to a defendant who was so charged.

2

The petitioner also contends that State's Attorney C. Robert Satti, Jr., failed to disclose exculpatory connections between the evidence gathered in the P.T. Barnum Apartments home invasion and the evidence obtained concerning the Pettway store shootings. The court determines that this evidence was not suppressed regardless of its purportedly exculpatory character. "[I]t is well established that 'evidence' is not considered to have been suppressed within the meaning of the *Brady doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that* [*evidence*]." (Emphasis in original; internal quotation marks omitted.) *State* v. *Skakel*, 276 Conn. 633, 701, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006).

The following evidence pertains to the issue of suppression. The police recovered several cartridge casings from the fusillade of shots fired by the various perpetrators in the Pettway store incident of February 2, 2002. Among these were spent nine millimeter cartridges discharged from the same gun. Comparison testing disclosed that the same pistol that fired these shots was also used in five previous shootings in the Bridgeport area.

The written firearms comparison results were transmitted by the State's Attorney's office to Attorney Hopkins. This report contained the incident and case numbers for each earlier incident. In chronological order:

1. Incident number 010429-195 referencing shots fired on April 29, 2001, at or near the Marina Village area;

2. Incident number 010609-036, referencing shots fired on June 9, 2001, outside of the Pettway store;

3. Incident number 011012-294, referencing shots striking victim, Mark Mahoney, on Holley Street on October 12, 2001;

4. Incident number 011021-041, referencing shots fired on October 21, 2001, near the intersection of Roger and Stetson Streets; and

5. Incident number 020122-056, referencing the bullet fired by Jerry Kollock or accomplice into the kitchen cabinet during the P.T. Barnum Apartments home inva-

sion of January 27, 2002, as discussed previously.

Attorney Satti testified that his office provided Attorney Hopkins with this report. A copy of this report was found in Attorney Hopkins' file, corroborating this disclosure by the state. The petitioner argues that it was a *Brady* violation for the state to fail to go beyond this disclosure and also provide, without a defense request, the entire investigation file materials generated by the police with respect to the earlier shootings.

In *State* v. *Skakel*, supra, 276 Conn. 633, a police report mentioned that a witness was asked to assist in creating a composite sketch of a person the witness recalled having seen near the crime scene during the relevant time frame. Id., 697–98. The sketch itself was never provided, only the written reference to its existence. This was the case despite the fact that the defense had made a discovery request for production of sketches in general. On appeal, the defendant argued that the drawing could have bolstered the defense's third-party culpability defense because the sketch somewhat resembled one of the putative third-party suspects.

Our Supreme Court held that revelation of the existence of the sketch alone satisfied the constitutional burden of disclosing exculpatory material under the *Brady* rule. Id., 706. "[T]he composite drawing will not be deemed to have been suppressed by the state . . . if the defendant or the defendant's trial counsel reasonably was on notice of the drawing's existence but nevertheless failed to take appropriate steps to obtain it." Id., 702.

In *State* v. *Skakel*, supra, 276 Conn. 633, appellate counsel had contended that mere knowledge that a sketch was done was "[in]adequate notice of the exculpatory nature of the composite drawing." Id., 704–705. That is, until the defense saw the actual drawing, the defense lacked knowledge of its beneficial utility, and that other evidence misled the defense into opining that the sketch depicted someone else at whom the defense wished to point an accusatory finger. Our Supreme Court responded that "[n]either of these assertions is reason to excuse the defense's failure to have requested the drawing [specifically]." Id., 705. "We . . . decline to endorse such an approach because there simply is no reason why a defendant who is aware of such evidence should not be required to seek it at a point in time when any potential constitutional infirmity arising from the state's failure to provide the evidence can be avoided without the need for a new trial." Id., 706. "We conclude, therefore, that the facts fully support the trial court's determination that the defendant failed to establish that the state suppressed the composite drawing within the meaning of *Brady*." Id., 707.

In other words, the state must disclose the data which

is potentially exculpatory but is not constitutionally obligated to connect the dots for the defense. The circumstances of the present case are more compelling that no *Brady* violation occurred than those presented in the *Skakel* case. This is because the essential fact that the same weapon that was used in the February 2, 2002 Pettway store shooting had previously been used in several other cases, including the P.T. Barnum Apartments home invasion, was disclosed along with information identifying the files pertinent to those earlier shootings. The potential for this information to help exonerate the [petitioner] speaks for itself.

The *Brady* doctrine does not "permit the defense to close its eyes to information likely to lead to the discovery of [exculpatory] evidence." *Skakel* v. *State*, 295 Conn. 447, 521, 991 A.2d 414 (2010). The court holds that the state satisfied its constitutional duties under *Brady* by providing to the defense the list of specific incidents/case numbers for which the firearms analyses showed that one of the weapons used on February 2, 2002, was also used in those shootings. Therefore, the petitioner has failed to meet his burden of proving his *Brady* claims.

INEFFECTIVE ASSISTANCE OF DEFENSE COUNSEL

In the fifth and sixth counts of the amended petition, the petitioner alleges various instances of ineffective assistance of trial counsel, Attorney Hopkins. These claims must be dismissed, pursuant to Practice Book § 23-29 (3), because they present the same grounds for relief denied in his earlier habeas case, namely, the ineffective assistance of defense counsel and which are not based on new facts or evidence "not reasonably available at the time of the prior petition . . . ." The addition of new specifications of ineffective assistance against Attorney Hopkins is insufficient to state new legal grounds different from that raised by the previous habeas petition. See, e.g., *McClendon* v. *Commissioner of Correction*, 93 Conn. App. 228, 230, 888 A.2d 183, cert. denied, 277 Conn. 917, 895 A.2d 789 (2006).

Of course, the failure by Attorneys Mullaney and Rozwaski to assert and prove these specifications of ineffective assistance can form the basis for a claim of ineffective assistance by previous habeas counsel, and the petitioner asserts just such a claim in the present case in the eighth count.

INEFFECTIVE ASSISTANCE OF HABEAS COUNSEL

Our Supreme Court has adopted the two-pronged *Strickland* test; *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); for evaluating ineffective assistance claims. *Johnson* v. *Commissioner of Correction*, 218 Conn. 403, 425, 589 A.2d 1214 (1991); *Ostolaza* v. *Warden*, 26 Conn. App. 758, 761, 603 A.2d 768, cert. denied, 222 Conn. 906, 608 A.2d 692 (1992). The *Strickland* criteria require that the peti-

tioner demonstrate, by a preponderance of the evidence, that his attorney's performance was substandard and that there exists a reasonable likelihood that the outcome of the proceedings would have been different. *Ostolaza* v. *Warden*, supra, 761.

As to the performance prong of *Strickland*, the petitioner must establish that habeas counsel's representation fell below an objective standard of reasonableness. *Johnson* v. *Commissioner of Correction*, supra, 218 Conn. 425.

This standard of reasonableness is measured by prevailing, professional practices. Id. The habeas court must make every effort to eliminate the distorting effects of hindsight and to reconstruct the circumstances surrounding counsel's conduct from that attorney's perspective at the time of the representation. Id.

If it is easier to dispose of a claim of ineffective assistance on the ground of insufficient proof of prejudice, the habeas court may address that issue directly without reaching the question of counsel's competence. *Pelletier* v. *Warden*, 32 Conn. App. 38, 46, 627 A.2d 1363, cert. denied, 277 Conn. 920, 632 A.2d 694 (1993). In order to satisfy the prejudice prong of the *Strickland* test, the petitioner must prove that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Levine* v. *Manson*, 195 Conn. 636, 640, 490 A.2d 82 (1985). Reasonable probability means a probability sufficient to undermine confidence in the outcome; *Daeira* v. *Commissioner of Correction*, 107 Conn. App. 539, 542–43, 946 A.2d 249, cert. denied, 289 Conn. 911, 957 A.2d 877 (2008); that is, the petitioner must show that there is a reasonable probability that he remains burdened by an unreliable determination of guilt. Id. Thus, the failure of the petitioner to establish, by a preponderance of the evidence, either the allegations against trial counsel or habeas counsel, or the requisite prejudice as to both the first habeas case and the criminal trial, will defeat a claim for habeas corpus relief in the present action.

In *Lozada* v. *Warden*, 223 Conn. 834, 613 A.2d 818 (1992), our Supreme Court recognized a purely statutory right to raise, in a subsequent habeas action, a claim of ineffective assistance on the part of previous habeas counsel in presenting claims of ineffective assistance of trial counsel. Id., 835. However, the petitioner's burden becomes a multitiered application of the *Strickland* standard by which allegations of ineffective assistance claims are gauged. Id., 842. To succeed in his bid for a writ of habeas corpus, the petitioner must prove *both* (1) that his habeas counsel were ineffective, and (2) that his trial counsel was ineffective. Id. Also, the petitioner must prove that, but for the derelictions of habeas counsel, he was prejudiced in the sense that the outcome of the first habeas case was suspect, and

that burden demands proof of the existence of a reasonable likelihood that the outcome of the original, criminal trial would have been different. Id., 842–43. The Supreme Court described this double layered obligation as "a herculean task . . . ." Id., 843.

Although the amended petition recites sundry specifications of ineffective assistance of habeas counsel, in his posttrial brief the petitioner engages in more than a cursory discussion only as to the following alleged deficiencies of habeas counsel:

1. That habeas counsel failed to raise and litigate Attorney Hopkins' failure to pursue third-party culpability theories adequately;

2. That habeas counsel failed to raise and litigate the insufficiency of Attorney Hopkins' cross-examination of Manual Rosado;

3. That habeas counsel failed to raise and litigate Attorney Hopkins' failure to connect the Pettway store shooting of February 2, 2002, to the P.T. Barnum Apartments home invasion that occurred about one week earlier; and

4. That habeas counsel failed to litigate adequately Attorney Hopkins' failure to raise and pursue an alibi defense. (See Petitioner's Posttrial Brief, pp. 19–21, 45–50.)

At the previous habeas trial, Attorney Mullaney represented the petitioner and was joined, on the third day of the habeas trial, in that endeavor by Attorney Rozwaski. The operative, amended petition was dated December 15, 2009, and alleged that Attorney Hopkins represented the petitioner ineffectively by:

1. Failing to present favorable and available evidence as to

a. alibi witnesses;

b. the weaknesses regarding the state's identification witnesses;

2. Failing to impeach the testimony of Gary Burton, Manual Rosado, and Tony Payton, properly.

The evidence adduced at the first habeas trial can be summarized as follows. Vincent Wilson, an incarcerated felon, testified that he and the petitioner are good friends, having first met as children. Wilson recounted that soon after the Pettway store shooting on February 2, 2002, the police interrogated him about whether he drove the getaway vehicle and whether the petitioner participated in the shootings. Wilson denied being at the scene and disclaimed any knowledge concerning the incident. Wilson stated that the police told him that Manual Rosado suggested that Wilson might have driven the getaway car.

Wilson also noted that Attorney Hopkins' investigator

had interviewed him, but that Attorney Hopkins had not spoken to him personally. Wilson further avowed that he was available to testify at the petitioner's criminal trial and would have willingly done so. However, Wilson acknowledged that he did witness a verbal confrontation between the petitioner and Manual Rosado at the Pettway store a few weeks before Rosado was shot there.

Attorney Mullaney also called upon Ralph Lewis to testify. He, too, is an incarcerated felon, and he related that he had met Manual Rosado in jail. Friction between Rosado and Lewis ensued. Lewis stated that Rosado told him that Rosado faced federal charges. He also indicated that Rosado stated he did not see who shot his brother, Polo, although the police urged him to report that he could identify his brother's killer in order to benefit himself in his federal case. However, Rosado also related that he resisted the police suggestion because he did not see who shot his brother.

Lewis first conveyed this information to an investigator in 2007, which was a few years after the petitioner's criminal trial. Lewis conceded that, despite knowing that charges were pending against his close friend, the petitioner, he never mentioned his jailhouse conversation with Rosado to anyone before 2007.

It should be noted that Rosado's statements to Lewis essentially conformed to Rosado's testimony at the petitioner's criminal trial and to his deposition testimony in the present habeas case. That is, Rosado consistently acknowledged his ignorance as to his brother's shooter, as opposed to his own assailant, who he identified as the petitioner. Rosado also maintained that he has always refused to lie to identify his brother's killer.

Attorney Mullaney also presented the testimony of the petitioner's sister, Rosa Lopez, at the previous habeas trial. She swore that during February 1, 2002, a Friday, she and the petitioner were together at their mother's residence and agreed to have a Super Bowl party that Sunday, February 3, 2002. A relative, Star Semedo, picked up Lopez and the petitioner and drove them to her home in Ansonia to plan the party. The party was to take place at Semedo's residence, and the expected attendees were Semedo, Lopez, the petitioner, their parents, and children. Lopez avowed that she and the petitioner spent the entire evening of February 1 into February 2, 2002, at Semedo's residence and only returned to Bridgeport during the afternoon of February 2, 2002. In other words, Lopez testified that the petitioner was in Ansonia at the time of the Pettway store shootings in Bridgeport.

Lopez attended her brother's criminal trial and expected to testify at that trial regarding this alibi. Attorney Hopkins had spoken to her before trial. When she was not called as a witness, she asked Attorney Hopkins

to explain his decision. Attorney Hopkins simply informed Lopez that her testimony was not needed.

Star Semedo, an emergency room technician nurse, also testified at the first habeas trial. She corroborated that she lived in Ansonia on February 1, 2002; that she drove Lopez and the petitioner from Bridgeport to Ansonia on February 1, 2002; that she, Lopez, and the petitioner planned the Super Bowl party details; and that Lopez and the petitioner stayed at her residence in Ansonia until Semedo drove them back to Bridgeport during the day of February 2, 2002.

Semedo indicated she was available to testify at the petitioner's criminal trial, but that no one called upon her to do so. Semedo acknowledged that she was aware that she possessed alibi testimony for the charges against the petitioner early on, but never conveyed that alibi evidence to the police or to defense counsel despite that awareness.

At the previous habeas trial, the petitioner testified consistently with this alibi scenario. He stated that he communicated these facts to Attorney Hopkins and the defense investigator, Justine Smith. He wanted and anticipated Attorney Hopkins to present Lopez and Semedo as alibi witnesses at his criminal trial. Attorney Hopkins declined to present the alibi defense.

The petitioner also wanted Attorney Hopkins to investigate whether Gary Burton described the shooters to the police as three black males. He urged Attorney Hopkins to probe this topic when Attorney Hopkins cross-examined Burton, but Hopkins rejected his suggestion.

On February 2, 2002, the petitioner was arrested by the police on an unrelated attempted murder charge. The police arrested the petitioner on charges arising from the Pettway store shootings about nine months later. At the time of his arrest on February 2, 2002, the petitioner resided with his mother in Bridgeport, but he pretended to live with an uncle in Stratford to avoid detection for violating a court order or condition of parole or probation prohibiting him from living in his mother's home.

Attorney Mullaney also offered the testimony of Bridgeport Police Sergeant Giselle Doszpoj. Sergeant Doszpoj indicated that she initiated the investigation of the Pettway store shooting on February 2, 2002. She noted that the investigation files for the case had been archived, and she lacked access to their contents. She recollected that, when she interviewed Gary Burton, he thought the three shooters were possibly African American.

Habeas counsel also utilized the testimony of Bridgeport Police Detective Warren DelMonte. Detective Del-Monte went to the hospital on February 2, 2002, and interviewed Manual Rosado. The habeas judge disal-

lowed Detective DelMonte from testifying about the substance of his conversation with Rosado.

A more productive witness was Kiaga Johnson. As noted previously, she was a friend of Gary Burton and saw the shootings. She indicated she observed three assailants and described them as including a black male, a Hispanic male, and a male with olive toned skin color. At the 2010 habeas trial, she opined that the petitioner's skin color seemed different from any of the assailants. However, she acknowledged that the attackers' faces were partially concealed and that there may have been additional shooters besides the three she noticed.

As mentioned previously, Attorney Rozwaski appeared as habeas counsel on March 11, 2011, the third day of the previous habeas trial. On that day, Attorney Berke testified that he took over the petitioner's criminal case after the jury returned its verdict. Attorney Berke had his investigator, John McNichols, look into the petitioner's alibi claim and contact Rosa Lopez and Star Semedo in particular. Attorney Berke spoke to Semedo by phone. Semedo told Attorney Berke that the petitioner and his sister stayed overnight at her Ansonia residence but not on the evening and night of the Pettway store shootings on February 1 into February 2, 2002.

At the first habeas trial, Attorney Hopkins testified that he had experience handling many criminal defense cases, including serious felony allegations, before representing the petitioner. He related that he hired Justin Smith as his investigator. Attorney Hopkins employed his customary approach of meeting with his client, engaging in preliminary discussions with the prosecutor, obtaining discovery, and developing a sense of the strengths and weaknesses of both sides of the case.

The petitioner denied any involvement in the Pettway store shootings. Attorney Hopkins decided that the critical defense tactic would be to try to discredit the credibility and reliability of the two eyewitnesses that identified the petitioner as one of the assailants, namely, Manual Rosado and Tony Payton.

Attorney Hopkins opted to eschew an alibi defense based on reasons both general and particular. After discussing the alibi evidence with the petitioner, Attorney Hopkins concluded that such evidence would prove more detrimental than beneficial. He regarded the alibi defense as generally a "bad idea" that seldom produced favorable results. Attorney Hopkins felt that unless the alibi evidence was "entirely solid," any deficiencies in that evidence create a very negative view of the defendant in the minds of jurors. That negative view may taint other, stronger defense arguments. Attorney Hopkins' "instinct" was to avoid using alibi evidence "like the plague."

This court's more than forty-five years of experience in the field of criminal law litigation finds Attorney

Hopkins' general view of the ineffectiveness of an alibi defense as not lacking some experiential basis. Of course, each case presents unique circumstances, and the utility of presenting alibi evidence must be evaluated with those specific features in mind. But, any chink in the armor of the alibi defense arising at trial, exposes the defense to claims of contrivance and, inferentially, a consciousness of guilt. Also, strong alibi evidence often induces the prosecution to reevaluate the charges against an accused, so that "solid" alibi cases seldom reach the trial stage.

In particular, Attorney Hopkins was concerned that the petitioner was a convicted felon who had tried to use false alibi evidence in a previous criminal case. Also, Attorney Hopkins presumed, erroneously, that the petitioner's arrest on February 2, 2002, was for the Pettway store shootings. Instead, that arrest pertained to unrelated charges. This mistake led Attorney Hopkins to reckon that if the petitioner had a legitimate alibi, he and his family members would have immediately informed the police of his true whereabouts for the evening of February 1 into February 2, 2002. So while Attorney Hopkins' general apprehension about using the alibi as a defense may have been professionally understandable, his decision particularly and arrived at purposely to disregard such evidence in the petitioner's particular case was based on a nonexistent factual foundation.

Because Attorney Hopkins harbored this negative opinion, he never pursued that line of defense at the petitioner's criminal trial, despite his client's imploring him to do so and his knowledge of the availability of the prospective testimony of Rosa Lopez and Star Semedo. That is not to say, of course, that such alibi evidence was reasonably likely to produce a different outcome had such evidence been presented, but it does establish that Attorney Mullaney, as habeas counsel, was warranted in alleging this deficiency in the earlier habeas case.

Attorney Mullaney also introduced evidence that Attorney Hopkins failed to challenge the reliability of Manual Rosado's identification of the petitioner, as having shot him, by calling Latosha DelGiudice as a defense witness. Ms. DelGiudice, also a convicted felon, testified at the first habeas trial that she visited Rosado at the hospital some hours after he was shot. At that time, Rosado accused her of setting him up and blamed her boyfriend, Brad Rainey, for the incident. She indicated that Rosado never mentioned the petitioner at that time.

Along a similar vein, Attorney Mullaney proffered the testimony of Lakesha Bowles, the girlfriend of Jerry Kollock, who disclosed that she received several phone calls from Manual Rosado on February 2, 2002, wherein Rosado also accused her of assisting in arranging the Pettway store attack. Bowles was under federal indict-

ment at the time of her habeas testimony.

Attorney Mullaney called Attorney Norm Pattis as a criminal defense expert to demonstrate the substandard nature of Attorney Hopkins' representation. Attorney Pattis is a very experienced lawyer whose background includes expertise in the field of criminal defense work. Attorney Pattis opined that the putative alibi testimony of Rosa Lopez and Star Semedo would have enhanced rather than detracted from Attorney Hopkins' attempt to discredit the identification testimony of Manual Rosado and Tony Payton. This was the case because evidence that an individual was elsewhere is completely compatible with misidentification.

Attorney Pattis stated that Attorney Hopkins' failure to interview the alibi witnesses departed from the minimum exercise of reasonable legal assistance ordinarily expected of competent defense counsel. This expert doubted whether any lawyer can accurately assess the usefulness of potential witnesses without ever interviewing those individuals.

At the previous habeas trial, the petitioner confirmed that his arrest, for the charges he stands convicted for the present case, came about nine months after the Pettway store shootings. He also stated that he never attempted to utilize a false alibi defense in any other case.

Judge Fuger denied habeas corpus relief; *Lopez* v. *Commissioner of Correction*, supra, Superior Court, Docket No. CV-05-4000857-S; and the Appellate Court affirmed his decision, per curiam. *Lopez* v. *Commissioner of Correction*, supra, 150 Conn. App. 905. Judge Fuger specifically found that the testimony of Rosa Lopez and Star Semedo lacked credibility. "This court . . . finds that the alibi evidence is not worthy of belief and that [Attorney Hopkins] cannot be held to be ineffective for failing to present a defective alibi defense." *Lopez* v. *Commissioner of Correction*, supra, Superior Court, Docket No. CV-05-4000857-S.

Consequently, the habeas court determined that the petitioner had failed to meet his burden of proving either prong of the *Strickland* standard with respect to Attorney Hopkins' refusal to offer alibi evidence at the petitioner's criminal trial. Id. "[D]efense counsel made the correct strategic judgment in not pursuing this alibi and calling these missing witnesses in order to establish an alibi defense that may well have led a jury to conclude that the petitioner was lying to escape a finding of guilty." Id.

1

The petitioner now contends that habeas counsel rendered ineffective assistance by his strategic decision to press Attorney Hopkins' failure to present alibi evidence as the principal ground in the previous habeas case and that Attorney Mullaney's unsuccessful attempt

to do so was, itself, constitutionally infirm. The court rejects this contention.

Attorney Mullaney had available to him the evidence that was available to Attorney Hopkins bearing on a third-party culpability defense. Attorney Mullaney also utilized the services of an investigator, Jacqueline Bainer, who thoroughly briefed him as to the results of her findings concerning evidence of third-party culpability. In particular, Bainer sought and obtained evidence concerning the possibility that the Pettway store shootings of February 2, 2002, were retaliation for the P.T. Barnum Apartments home invasion which occurred about one week earlier. The gist of this putative defense appears to be that Brad Rainey sought revenge against Manual Rosado and his brother, Polo, for having botched the home invasion of Colbert's apartment by firing a gun at a young child and groping the vagina of a teenage girl.

It should be recalled that three victims of that home invasion, namely, Colbert, her thirteen year old son, and Davis Brown, all positively identified Jerry Kollock as one of the perpetrators and possibly the person who fired the shot that lodged in the kitchen cabinet. A firearms expert determined that round was discharged from one of the handguns used in the Pettway store shootings.

Brown also identified the second gunman as Randy Armstrong, Kollock's frequent companion, and the person whom the petitioner had accidently shot in the foot two days before the home invasion. Brown also named Brad Rainey as the third accomplice who urged the gunmen to leave Colbert's apartment and make their getaway.

On the other hand, after Jerry Kollock's arrest, Kollock told Bainer that his cohorts were Polo and Manual Rosado, with Rosado being the lookout. To complicate matters further, Bridgeport Police Sergeant Larose received information that Robert Payton (deceased) was the second gunman.

Bainer also uncovered evidence that the petitioner and Robert Payton had a "beef" stemming from a dispute between the mother of the petitioner's child and Rosado's sister. Robert Payton, who was killed in a later incident, was one of the persons at the Pettway store on February 2, 2002, who managed to escape into the relative safety of the store unscathed.

Investigator Bainer urged Attorney Mullaney to raise an ineffective assistance claim in the first habeas case based on Attorney Hopkins' failure to obtain the information she uncovered and present a third-party culpability defense, in addition to the lack of an alibi defense which Attorney Mullaney did litigate. This third-party culpability claim is premised on speculation that Brad Rainey and Tank Gethers harbored great resentment against Polo, Manual Rosado, and Robert Payton for

having botched the home invasion, coupled with Manual Rosado's initial failure to identify the petitioner as the person who shot him to the police and Latosha DelGiudice. Despite Bainer's earnest discussions with Attorney Mullaney on this point, Attorney Mullaney deliberately chose to confine the ineffective assistance specifications to the allegations recited above, i.e., primarily the failure by Attorney Hopkins to present an alibi defense.

Attorney Mullaney testified at the present habeas trial, and he recounted that, in his judgment, the petitioner had a strong claim of ineffective assistance based on Attorney Hopkins' decision to forgo an alibi defense. Attorney Mullaney exercised that professional judgment and experience by opting to avoid muddying the habeas case with weaker claims such as the convoluted, third-party culpability argument. Attorney Mullaney's experience persuaded him that third-party culpability defenses often fail because the evidence relies on a good deal of conjecture and innuendo, as in the petitioner's case. The court agrees with Attorney Mullaney's assessment that Attorney Hopkins' failure to present an alibi defense, based on the known and available testimony of Rosa Lopez and Star Semedo, was a much stronger claim than the third-party culpability claim suggested by Bainer's investigation.

It must be observed that the petitioner, at the habeas on a habeas trial, never presented a legal expert who criticized habeas counsel's representation. The petitioner did proffer the testimony of Attorney Kenneth Simon, but that expert confined his opinions to an evaluation of Attorney Hopkins' performance in the criminal case.

Effective advocates bear no general constitutional obligation to raise or argue every conceivable issue. *Tillman* v. *Commissioner of Correction*, 54 Conn. App. 749, 757, 738 A.2d 208, cert. denied, 251 Conn. 913, 739 A.2d 1250 (1999). To the contrary, a scattershot approach "runs the risk of burying good arguments . . . in a verbal mound made up of strong and weak contentions." (Internal quotation marks omitted.) Id. Habeas courts must be "highly deferential" to attorneys' decisions to winnow out less persuasive claims in order to focus on the stronger ones. *Spearman* v. *Commissioner of Correction*, 164 Conn. App. 530, 539, 138 A.2d 378, cert. denied, 321 Conn. 923, 138 A.2d 284 (2016).

"[S]trategic choices made after thorough investigations of law and facts relevant to plausible options are virtually unchallengeable . . . ." (Internal quotation marks omitted.) *Arroyo* v. *Commissioner of Correction*, 172 Conn. App. 442, 467–68, 160 A.3d 425, cert. denied, 326 Conn. 921, 169 A.3d 235 (2017); see also *Bree* v. *Commissioner of Correction,* 189 Conn. App. 411, 207 A.3d 539 (2019).

In the present action, the credible evidence discloses that Attorney Mullaney retained the services of an investigator who diligently researched the shootings where the same handgun was used that predated the Pettway store incident of February 2, 2002. Bainer and Attorney Mullaney had frank discussions about the evidence Bainer's investigation produced. Attorney Mullaney made the tactical decision to restrict the earlier habeas claims to Attorney Hopkins' refusal to present available alibi evidence.

This court finds that Attorney Mullaney's tactical decision in this regard falls well within the realm of reasonable, professional advocacy for habeas counsel in his position. As described previously, Attorney Hopkins misunderstood the charges for which the petitioner was arrested on February 2, 2002, believing those charges to pertain to the Pettway store shootings of that date. He erroneously concluded that the lack of protest to the police by the petitioner's family based on an alibi for the evening of February 1 into February 2, 2002, cast doubt on the efficacy of an alibi defense and would jeopardize the petitioner's entire criminal case. Attorney Hopkins also feared that the petitioner had tried to employ a false alibi in a previous criminal matter. Attorney Mullaney felt that the petitioner could have successfully refuted any assertion that the petitioner had previously attempted to use a fictitious alibi.

Previous habeas counsel also assessed that Attorney Hopkins had three alibi witnesses, including the petitioner, who could establish a viable alibi defense and were available to testify at the petitioner's criminal trial. Attorney Mullaney also stated that the alibi evidence would not have undermined the defense that Attorney Hopkins did pursue, namely, that Tony Payton and Manual Rosado had misidentified the petitioner as one of the shooters in the Pettway store attack.

On the other hand, the petitioner's present denigration of Attorney Mullaney's decision not to add a claim that Attorney Hopkins should have also pursued a third-party culpability defense appears counterintuitive and abstruse.

The petitioner submits that Attorney Hopkins, and derivatively, habeas counsel, ought to have attempted to demonstrate that the Pettway store shootings were prompted by the excesses engaged in during the P.T. Barnum Apartment home invasion of the week before. Specifically, that Polo, Manual Rosado, and, possibly, Robert Payton, were targeted by Tank Gethers and Brad Rainey, affiliates of Polo, Rosado, and Payton, in retribution for having fired a weapon, with a nexus to Rainey and Gethers, during the home invasion; and for molestation of the teenage stepdaughter of Colbert, an untoward act which would incite unwanted attention and notoriety to the home invasion. To be clear, the peti-

tioner contends that the Pettway store shootings were not, as one might otherwise suppose, the actions of rival drug dealers or gang members, but rather one with internecine character.

Just who participated in the P.T. Barnum Apartments home invasion was in dispute, as mentioned earlier. Davis Brown identified Kollock, Armstrong, and Rainey as the perpetrators. Kollock told Bainer that his accomplices were Polo and Manual Rosado. Brad Rainey, a/k/a Brad Payton, was the cousin of Tony and Robert Payton. The court also notes that Attorney Hopkins lacked the benefit of the information later revealed by Marcus Mahoney.

In addition to this scenario, the petitioner points to the testimony of the first habeas trial of Latosha DelGiudice. In her testimony, Latosha DelGiudice related that, when she visited Manual Rosado in the hospital, he accused her boyfriend, Brad Rainey, of using her to set him and his brother up for the attack. She further testified at the first habeas trial that Rosado never mentioned the petitioner at all.

The court finds this third-party culpability evidence and the inferences sought to be drawn from it to be tangled, tenuous, and conjectural. By comparison, the evidence regarding Attorney Hopkins' failure to present alibi evidence appears clear, concise, internally consistent, and not laden with suppositions and surmise. The court concludes that Attorney Mullaney's decision to pursue only the stronger ineffective assistance claim of lack of an alibi defense rather than the more nebulous third-party culpability claim was a reasonable exercise of professional judgment based on diligent investigation and competent understanding of the law.

Unsuccessful strategic decisions that are the result of the reasonable exercise of professional judgment comprise effective assistance despite an unfavorable outcome. *Stephen S.* v. *Commissioner of Correction*, 134 Conn. App. 801, 809–10, 40 A.3d 796, cert. denied, 304 Conn. 932, 43 A.3d 660 (2012). Therefore, the court determines that the petitioner has failed to prove the deficient performance component of the *Strickland* test regarding the representation at the first habeas trial by Attorneys Mullaney and Rozwaski regarding the failure to raise Attorney Hopkins' failure to investigate and present a third-party culpability defense.

2

The petitioner also alleges that Attorneys Mullaney and Rozwaski rendered ineffective assistance by inadequately proffering evidence of Attorney Hopkins' failure to pursue the alibi defense. To reiterate, no legal expert testified in the present habeas case that previous habeas counsel were deficient in any manner.

Specifically, the petitioner complains that his habeas attorneys "inadequately" challenged Attorney Hopkins'

testimony about his misunderstanding that an alibi defense is an affirmative defense; that habeas counsel should have "better developed" Attorney Hopkins' misinterpretation of the charges for which the petitioner was arrested on February 2, 2002; and that Attorney Norm Pattis was a poor choice of an expert witness to demonstrate Attorney Hopkins' deficiencies. The court rejects these claims because the petitioner has failed to prove the prejudice prong of the *Strickland* criteria, i.e., that there exists a reasonable likelihood that the outcome of the first habeas case would have been favorable but for these purported deficiencies.

As elaborated previously, Judge Fuger denied habeas corpus relief because he found the testimony of the alibi witnesses, Rosa Lopez and Star Semedo, lacked credibility. That dispositive finding, affirmed per curiam by the Appellate Court, bears no relation to the decision to call Attorney Pattis as an expert witness. Nor did Attorney Hopkins' erroneous view of the law or the basis for the petitioner's arrest on February 2, 2002, contribute to that finding. The adverse decision by Judge Fuger hinged on the witnesses' nonbelievability, which determination cannot be attributed to the deficiencies alleged by the petitioner on the part of his former habeas counsel.

3

The final allegation of ineffective assistance by habeas counsel, as set forth in the petitioner's posttrial brief, is that previous habeas counsel ought to have attacked Attorney Hopkins' cross-examination of Manual Rosado more vigorously. Again, no legal expert decried habeas counsel's representation on this issue. The petitioner's posttrial brief contains little discussion as to this claim, and the court treats it as abandoned. In sum, the court denies the amended petition on the ground of ineffective assistance of habeas counsel.

ACTUAL INNOCENCE CLAIM

Habeas corpus relief in the form of a new trial based on actual innocence requires the petitioner to satisfy the criteria set forth in *Miller* v. *Commissioner of Correction*, 242 Conn. 745, 700 A.2d 1108 (1997).

The *Miller* criteria comprise a two part test which requires a habeas petitioner asserting an actual innocence claim to prove, by clear and convincing evidence, that:

1. The petitioner is actually innocent of the crime for which he or she stands convicted; and

2. No reasonable fact finder would convict the petitioner of that crime after consideration of a combination of the evidence adduced at both the criminal trial and the habeas proceeding. *Miller* v. *Commissioner of Correction*, supra, 242 Conn. 746–47; see also *Gould* v. *Commissioner of Correction*, 301 Conn. 544, 557–58,

22 A.3d 1196 (2011).

The first component of the *Miller* criteria requires the petitioner to produce affirmative proof that he did not purposefully participate in the charges for which he was convicted. "Affirmative proof of actual innocence is that which might tend to establish that the petitioner *could not* have committed the crime even though it is unknown who committed the crime, that a *third party* committed the crime or that *no* crime actually occurred." (Emphasis in original.) *Gould* v. *Commissioner of Correction*, supra, 301 Conn. 563. "Clear and convincing proof of actual innocence does not, however, require the petitioner to establish his or her guilt is a factual impossibility." Id., 564.

Before embarking on this analysis, the court must confront a preliminary question. In the *Gould* case, our Supreme Court recognized, in a footnote, that the court has never decided whether the affirmative evidence of innocence must be newly discovered. Id., 551 n.8. The Supreme Court acknowledged, however, that the Appellate Court has imposed such a requirement. Id.

Indeed, the Appellate Court has consistently and repeatedly demanded that affirmative proof of actual innocence be newly discovered. *McClain* v. *Commissioner of Correction*, 188 Conn. App. 70, 88, 204 A.3d 82, cert. denied, 331 Conn. 914, 204 A.3d 702 (2019), *Corbett* v. *Commissioner of Correction*, 133 Conn. App. 310, 315, 34 A.3d 1046 (2012); *Vasquez* v. *Commissioner of Correction*, 128 Conn. App. 425, 444, 17 A.3d 1089, cert. denied, 301 Conn. 926, 22 A.3d 1277 (2011); *Gaston* v. *Commissioner of Correction*, 125 Conn. App. 553, 558–59 (2010), cert. denied, 300 Conn. 908, 12 A.3d 1003 (2011); *Weinberg* v. *Commissioner of Correction*, 112 Conn. App. 100, 119, 962 A.2d 155, cert. denied, 291 Conn. 904, 967 A.2d 1221 (2009); *Grant* v. *Commissioner of Correction*, 103 Conn. App. 366, 369, 928 A.2d 1245, cert. denied, 284 Conn. 921, 933 A.2d 723 (2007); *Johnson* v. *Commissioner of Correction*, 101 Conn. App. 465, 469–70, 922 A.2d 221 (2007); *Batts* v. *Commissioner of Correction*, 85 Conn. App. 723, 726–27, 858 A.2d 856, cert. denied, 272 Conn. 907, 863 A.2d 697 (2004); *Clarke* v. *Commissioner of Correction*, 43 Conn. App. 374, 379, 682 A.2d 618 (1996), appeal dismissed, 249 Conn. 350, 732 A.2d 754 (1999); *Williams* v. *Commissioner of Correction*, 41 Conn. App. 515, 530, 677 A.2d 1 (1996), appeal dismissed, 240 Conn. 547, 692 A.2d 1231 (1997). This court is, of course, bound by these holdings of the Appellate Court.

The Appellate Court has stressed that habeas judges are bound by the requirement that the evidence of actual innocence be newly discovered. *Thompson* v. *Commissioner of Correction*, 172 Conn. App. 139, 158, 158 A.3d 814, cert. denied, 325 Conn. 927, 169 A.3d 232 (2017). "[E]ven though the final resolution of the newly discovered evidence standard has yet to be addressed by the

Supreme Court, it is beyond argument that insofar as any Superior Court considering a [claim] of actual innocence in a habeas petition, the matter is *closed*." (Emphasis added.) Id.

Newly discovered evidence is "such that it could not have been discovered previously despite the exercise of due diligence . . . ." *Skakel* v. *State*, 295 Conn. 447, 466–67, 991 A.2d 414 (2010). Due diligence is reasonable diligence. Id., 506. The query to be answered is "what evidence would have been discovered by a reasonable [criminal defendant] by persevering application and untiring efforts in good earnest." (Internal quotation marks omitted.) Id., 507.

The petitioner avers that Manual Rosado's habeas deposition contained inconsistencies when compared to his criminal trial testimony; that evidence linked the P.T. Barnum Apartments home invasion incident to the Pettway store shootings; that Latosha DelGiudice's previous habeas trial testimony regarding Rosado's failure to mention the petitioner as his assailant; and the present habeas trial testimony of Marcus Mahoney constitute clear and convincing evidence of the petitioner's actual innocence. The court disagrees.

1

First, the evidence connecting the weapon used at the P.T. Barnum Apartments home invasion with one also discharged during the Pettway store shootings cannot be fairly characterized as newly discovered.

The state provided Attorney Hopkins with a copy of the firearms analysis that ascertained that some rounds fired during the Pettway store shootings were discharged from the same pistol that either Kollock or Polo fired during the P.T. Barnum Apartments home invasion. Indeed, Attorney Mullaney's investigator used that report to investigate the five previous incidences in which that weapon was used. Therefore, potentially favorable, alternative explanations for the motivation for the Pettway store shootings, and by whom harbored, were available for production at the petitioner's criminal trial in the exercise of reasonable diligence. The petitioner has alleged just such a claim in his specifications of ineffective assistance by defense counsel and previous habeas counsel.

Consequently, the court cannot afford relief based on the claim that this was newly discovered evidence of the petitioner's actual innocence, standing alone.

2

Contrary to the petitioner's assessment, the court finds that Manual Rosado's criminal trial testimony and his later habeas deposition testimony were, as to essential details, significantly consistent and trustworthy; principally, as to who shot him. Any discrepancies go to credibility or the absence of it. It must be kept in

mind that, under the *Miller* criteria, newly discovered evidence that merely weakens the prosecution case, even that which severely weakens it, fails to comprise affirmative evidence of innocence.

In *Gould* v. *Commissioner of Correction*, supra, 301 Conn. 544, 546–47, our Supreme Court reversed a habeas court's determination of actual innocence based on the total recantation of the only witness who positively identified the defendants as the perpetrators of a murder of a shopkeeper. Her recantation stated that she was not at the scene when the shooting occurred, in direct contradiction to her trial testimony. The fact that the habeas court credited her recantation was irrelevant as to the claim of actual innocence. This was so because her revised story did not prove the defendants did not commit the murder but only that she was ignorant of who did. Such renunciation by a witness failed to constitute affirmative evidence of innocence. Id., 557–59.

In order to satisfy the affirmative evidence criterion of the *Miller* standard, the petitioner must prove, by clear and convincing evidence, that no crime occurred; that someone else committed the crime; or that the person convicted could not have committed the crime, even if the true perpetrator remains unknown. Id., 563. Actual innocence means factual innocence and is not equivalent to legal insufficiency of the evidence. Id., 560. The petitioner's burden is to prove he is actually innocent of the crime rather than merely that the state could no longer prove his guilt beyond a reasonable doubt. Id., 561. "Although the postconviction evidence [the petitioner] presents casts a vast shadow of doubt over the reliability of his conviction, nearly all of it serves only to undercut the evidence presented at trial, not affirmatively to prove [his] innocence." (Internal quotation marks omitted.) Id.

The petitioner's proof in the present case focuses on Rosado's initial failure to tell the police and others that the petitioner shot him; the nature and substance of threats conveyed to him before the shooting, and that he accused Brad Rainey of being behind the Pettway store shooting. None of these inconsistencies demonstrates that no shootings occurred, that someone else shot Rosado instead of the petitioner, or that the petitioner could not have been his assailant.

Thus, the putative inconsistencies by Rosado when comparing his criminal trial testimony to his habeas deposition cannot form the foundation of the petitioner's actual innocence claim. That is not to say that such inconsistencies are irrelevant to that claim when considered in conjunction with newly discovered evidence that satisfies the *Miller* test, but such supposed discrepancies, standing alone, fail to meet that test.

3

Next, the petitioner relies on the testimony of Latosha DelGiudice presented during the first habeas trial. There, she avowed that, about five or six hours after Rosado was shot, she snuck into the hospital to visit him. She related that Rosado voiced his suspicions that Brad Rainey, the father of Latosha's child, enlisted her to set up Rosado to be shot at the Pettway store. This accusation by Rosado was predicated on phone conversations he had with Latosha DelGiudice shortly before the shooting. She swore that Rosado never mentioned the petitioner at all.

First, such evidence is not proof of the petitioner's innocence. Rosado may have been mistaken or correct in his conjecture that Brad Rainey lurked behind the Pettway store shootings. However, witnesses counted the number of gunmen ranging from two to five. Rainey could have been the moving force behind the attack without exonerating the petitioner; that is, the petitioner could have shot Rosado while acting in concert with Rainey. At least four handguns and two shotguns were fired during the Pettway store shooting. Rosado's suspicions about Rainey do not exculpate the petitioner, although such evidence could be used to impeach Rosado's credibility.

Also, if Rosado suspected Latosha DelGiudice of complicity in the attack, Rosado would have good reason to withhold from her, and indirectly from Brad Rainey, and the petitioner, his complete knowledge of what happened. He was shot and his brother killed and vengeance was on his mind.

But more significantly, even if one assumes, arguendo, that Latosha DelGiudice's testimony that Rosado failed to remark to her that the petitioner was the person that shot him and that Rosado harbored a belief that Brad Rainey was also responsible for the attack, is evidence of the petitioner's actual innocence, her testimony was vulnerable to counterattack by the admission of testimony of other potential witnesses.

The petitioner offered and the court admitted exhibit 43, which consists of several documents prepared by the Bridgeport police during the investigation of the Pettway store shootings.

Shayla DelGiudice is Latosha's sister and gave the police a statement on February 8, 2002, that she visited Rosado at the hospital during his thirteen hour stay there. Latosha had also mentioned that she and her sister visited Rosado at the hospital during Latosha's second trip there. Shayla stated that Rosado told her that the petitioner shot him.

Also, Shayla DelGiudice's boyfriend, Daniel Vereen, also spoke to Rosado at the hospital. Vereen corroborated that Rosado named the petitioner as his shooter at that time.

While one never knows for certain whether a witness will later testify in accordance with the substance of what the police recorded the witness as saying at an earlier time, the possibility that the benefit of Latosha DelGiudice's testimony would be devastatingly undermined by the testimony of her sister and Vereen looms large. Therefore, the court assigns diminished weight to the existence of Latosha DelGuidice's testimony, even if regarded as evidence of actual innocence.

### 4

The testimony of Marcus Mahoney, during the present case, is clearly newly discovered. Mahoney first revealed his knowledge about the P.T. Barnum Apartments home invasion and the Pettway store shootings, to anyone in an official or quasi-official capacity, years after the petitioner's conviction. This revelation occurred when Mahoney agreed to speak with the petitioner's habeas investigator while he was confined at Webster Correctional Institution.

Mahoney presently serves a prison term and has several felony convictions in his past. From early adolescence, he has regularly used street drugs, including blunts, heroin, and ecstasy. He, Polo, and Robert Payton engaged in the sale of illicit drugs together in the Pettway store area of Bridgeport. Mahoney and Polo were so close that Mahoney regarded Polo as his brother.

To recapitulate, Brad Rainey was Robert and Tony Payton's cousin and father of Latosha DelGiudice's child. Latosha DelGiudice and Manual Rosado also sold drugs, cooperatively.

Mahoney testified that Rainey had a long-standing feud with the Rosado brothers and their associates. In the fall of 2001, Rainey shot Mahoney, striking him five times. The gun used by Rainey was the very same weapon used in the P.T. Barnum Apartments home invasion and at the Pettway store shooting. Mahoney has been shot two or three other times, including in the presence of Manual Rosado.

The gun in question appears well traveled. Besides the three incidents mentioned herein, it was also traced to at least two other shootings in 2001. Although Mahoney's testimony was sketchy on this point, it appears that the weapon belonged to Tank Gethers and/or Rainey, but kept in a garage to which Mahoney and Polo had access.

Mahoney stated that he knew the petitioner but had no significant dealings with him.

Mahoney, Polo, Manual Rosado, Tank Gethers, and Kollock believed that Barbie Colbert was a major drug dealer at the P.T. Barnum Apartments complex. They decided her apartment would make a lucrative target to rob. Mahoney and Polo surveilled her residence, and the group conceived a plan to conduct the robbery.

That plan entailed Kollock and Polo entering Colbert's apartment with guns drawn to induce the occupants to relinquish money and/or drugs. The handguns were to be used as "props" and not to be fired. The guns were supplied by Gethers.

In the early hours of January 27, 2002, Kollock, Polo, and Rosado left to execute the robbery. They returned around 7 a.m. The loot garnered was divided among the conspirators. However, Polo revealed that the robbery got out of hand, resulting in a shot fired at a young child and a teenage girl sexually assaulted.

Gethers was outraged by these departures from the plan. The gun could now be linked to that shooting and possibly traced to him. The assault would also heighten scrutiny by the police and/or the victim's associates.

Mahoney avowed that he was at the Pettway store on February 2, 2002, when Polo was killed. He heard someone shout, "Oh, shit!" He saw three gunmen whose faces were partially obscured by bandanas. Mahoney believed the three masked men to be Brad Rainey, Tank Gethers, and an individual he only knows as "K." Bullets began to whiz by, and Mahoney quickly ran across the street from the Pettway store, jumped a fence, and hid by or in his car. He recollected that Tank held a pump type shotgun.

Mahoney was uncertain as to what the result of the attack was. He phoned Polo, Manual Rosado, and Robert Payton, but no one returned his calls at first. Eventually, Robert Payton called Mahoney and informed him that Polo was dead and Manual Rosado wounded and in the hospital. Robert Payton cautioned Mahoney to stay away from the hospital and remain quiet about what had transpired.

About thirteen hours later, Rosado left the hospital and, along with Robert Payton went to Mahoney's residence. Tank Gethers drove up and an argument between Mahoney and Gethers ensued because Mahoney told him he knows who was responsible for the shooting. Gethers threatened Mahoney. Mahoney left the area, spending two or three months in Boston.

Mahoney testified that he did not see the petitioner, Tony Payton, or April Edwards at or near the Pettway store at the time of the shootings.

After he returned to Bridgeport, Mahoney learned that the police arrested the petitioner for his involvement in the Pettway store shootings. Despite believing the petitioner was innocent, Mahoney refrained from communicating his knowledge to the authorities. He attributed his silence to self-preservation, a reluctance to be labeled as a "rat," and a desire to avoid involvement in the case, generally.

When interviewed by the petitioner's habeas investigator years later, Mahoney decided to tell what he

believed he knew about the incident because he regretted that an innocent man was convicted of his close friend's murder when the real culprit was Brad Rainey.

The issue for the court to adjudicate, then, is whether Mahoney's exculpatory testimony, in combination with all the other evidence adduced, including the testimony of Latosha DelGiudice and the evidence connecting the P.T. Barnum Apartments home invasion with the Pettway store shootings, along with the original criminal trial evidence, establishes clear and convincing proof that no reasonable jury would convict the petitioner, if it received such evidence, and that the petitioner is factually innocent of the crimes. The petitioner faces a "heavy burden" to prevail under the *Miller* standard. (Internal quotation marks omitted.) *Gould* v. *Commissioner of Correction*, supra, 301 Conn. 567.

Contrary to the petitioner's position, the court finds the testimony of Manual Rosado identifying the petitioner as his assailant to be very credible. He has steadfastly maintained that identification.

Rosado's identification was corroborated by Tony Payton. Tony Payton observed the events unfold from a relatively safe vantage point and did not labor under the confusion, stress, and/or fear that the fusillade must have engendered in the minds and memories of those more exposed to its dangers. His supposed motives to lie appear very shallow.

The racial classifications and skin color testimony of the witnesses appears to the court to be particularly unuseful. Given the lack of reason for neutral witnesses to reflect upon and recollect the precise skin tones of persons firing bursts of bullets at targets unknown to them, at night, in a poorly lit area, it is entirely unsurprising that these witnesses' reports vary.

Gary Burton, a victim, thought the assailants were three black men, possibly. One of his female companions perceived the attackers to be composed of one black male, one Hispanic male, and one olive toned male. Of course, the shooters' lower faces were concealed. Therefore, the court attributes little significance to which of the witnesses' diverse descriptions of skin color comport with the petitioner's complexion or not.

Furthermore, through information received by the police as contained in exhibit 43, it is now the case that two individuals, Shayla DelGiudice and Daniel Vereen, said that they heard Rosado name the petitioner as his shooter very soon after the event while at the hospital.

Rosado has persistently denied knowing who killed his brother, Polo, and has refused to speculate on that question, nor has he stated he personally recognized any shooter besides the petitioner. If Rosado were of a mind to frame the petitioner, it seems incongruous that his mendacity would stop there and allow his brother's killer to remain unidentified.

Also, Rosado's identification of the petitioner as the person who shot him is not negated by his suspicion that Brad Rainey played some role in the event. As noted previously, evidence was adduced that the petitioner had engaged in menacing conduct toward Rosado and Robert Payton at the Pettway store before February 2, 2002. The petitioner's proof fails to dispel the possibility that Rosado's antagonists, Rainey and the petitioner, acted in concert.

It is clear that the same handgun fired at the P.T. Barnum Apartments home invasion was also used in the Pettway store shooting. But it is also apparent that weapon was well traveled. Gethers, and/or Rainey may have used the weapon, but it was also used to facilitate crimes by other persons.

Mahoney's testimony is fraught with circumstances that expose his credibility and/or reliability to derogation. His testimony conflicts with that of Tony Payton as to whether Payton and April Edwards were near the Pettway store during the shooting. No other eyewitness corroborated Mahoney's testimony as to the core issue of the identities of the shooters.

Mahoney bore a grudge against Brad Rainey. Mahoney testified that Rainey shot him five times because Rainey believed Mahoney had issued a threat to "get" Rainey previously. Mahoney acknowledged that the assailants wore bandanas concealing their lower faces and that, upon hearing bullets whiz by, he immediately fled the scene by running away from the locus of the gunfire. Mahoney claimed to regard Polo as his brother but allowed Polo's real killers to remain at large for years while the petitioner languished in prison for a shooting Mahoney knew he did not commit. These circumstances place great strain on the believability or accuracy of Mahoney's testimony, given years later.

Keeping in mind that the *Miller* level of proof goes beyond a mere preponderance to require a petitioner to bear the heavy burden of demonstrating his factual innocence by clear and convincing evidence, the petitioner has failed to carry that burden. Clear and convincing evidence is substantial and unequivocal evidence that produces a very high probability that the fact to be proven is true. *State* v. *Thompson*, 305 Conn. 412, 425, 45 A.3d 605 (2012), cert. denied, 568 U.S. 1146, 133 S. Ct. 988, 184 L. Ed. 2d 767 (2013); see *Gould* v. *Commissioner of Correction*, supra, 301 Conn. 560.

For these reasons, the amended petition for habeas corpus relief is denied.

* Affirmed. *Lopez* v. *Commissioner of Correction*, 208 Conn. App.    , A.3d    (2021).